**Virgil Euristi MARTINEZ, Appellant,**

v.

**The STATE of Texas.**

**No. 73131.**

Court of Criminal Appeals of Texas, En Banc.

May 17, 2000.

Brian W. Wice, Houston, for appellant.

Douglas Danzeiser, Asst. Atty. Gen., Austin, for State.

## OPINION

KELLER, J., delivered the opinion of the Court in which McCORMICK, P.J., and MEYERS, MANSFIELD and KEASLER, JJ., joined.

Appellant was convicted in April 1998 of three counts of capital murder arising from an episode occurring on October 1, 1996. Tex. Penal Code § 19.03(a)(7) & (8).[1] Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure, Article 37.071 §§ 2(b) and 2(e), the trial judge sentenced appellant to death. Article 37.071 § 2(g).[2] Direct appeal to this Court is automatic. Article 37.071 § 2(h). Appellant raises nineteen points of error. We will affirm.

## I. BACKGROUND

Veronica Fuentes lived in a trailer park in Brazoria County with her husband and their two children, Joshua and Cassandra, ages five and three. Sherry Graves was the landlord of the trailer park and lived in a house about forty to fifty feet from the Fuentes' trailer. Veronica became estranged from her husband and at some point dated appellant, but Veronica and appellant eventually "broke up." Several weeks before the murders from which this prosecution arose, Veronica told Graves that she was afraid of appellant, and if

appellant showed up, Graves should call the Sheriff's office.

On October 1, 1996, at around 11:00 p.m., as Graves was lying in bed, she heard banging noises and screaming coming from the direction of the Fuentes' trailer. She went to the Fuentes' trailer and listened at the window. She heard Veronica say. "No Virgil. No. Please no. Just go. Just go." An angry male voice referred to "your purse" and also to someone's dad as "a cop." Graves went to the front door and walked inside the living room area. She asked Veronica if she was okay. Sounding scared, Veronica responded, "Yes. Sherry, get help. Get help." Graves told Veronica that she was going to call 911, and she dialed 911 as she walked back toward her house. John Gomez came to Graves' house and mumbled, "Veronica's gone crazy. Gun at kids' heads." Graves tried to explain to the 911 operator what was happening.

Graves then saw Veronica in the Fuentes' front yard calling Virgil's name, saying "No Virgil. Oh my God." Graves then saw appellant shoot Veronica and Veronica fall to the ground. At this point, Gomez ran towards appellant, and appellant shot him. Graves ducked inside her home. Appellant ran off, passing within five to ten feet of Graves' window. The floodlights were on, and Graves saw appellant fiddling with a "holster-looking belt."

Robin Johnstone and her son Keith Burrow were neighbors of Veronica. Johnstone heard knocking and went outside to investigate. She saw people running across the street, then heard gunshots, and saw Gomez running toward a garage. Then she saw appellant run in front of Graves' house. She also noticed that ap-

1. The offense statute provides, in relevant part:

 A person commits an offense if he commits murder as defined under Section 19.02(b)(1) and:

 (7) the person murders more than one person:

 (A) during the same criminal transaction; or . . .
 (8) the person murders an individual under six years of age.

2. Unless otherwise indicated all future references to Articles refer to the Code of Criminal Procedure.

pellant was wearing a gun holster around his waist.

Burrow saw appellant shoot Veronica. He saw who appellant was by looking through a gunscope that made images look nine times closer.

The police arrived to find Veronica and her two children dead from multiple gunshot wounds. The children were found dead in their bed. Veronica was lying in the front yard, with wounds from ten to twelve bullets. The police found Gomez still alive, with seven gunshot wounds. Sergeant Thomas Tolson asked Gomez, "Who did this?" Gomez replied, "Boyfriend, girlfriend. Boyfriend, girlfriend. Ex-boyfriend." Tolson repeated the question, and Gomez replied, "Boyfriend, girlfriend, ex-boyfriend." Then Tolson asked, "Did the ex-boyfriend do this? Who did that?" and Gomez responded, "Ex-boyfriend." Gomez later died from the gunshot wounds.

Appellant fled to Del Rio. On October 2, 1996, at around 6:00 p.m., he called 911, claiming that he was hearing voices and he needed medical attention. Del Rio officers were dispatched to appellant's location, and he was taken to a hospital. Appellant's car was later found in Del Rio and searched.

Forensic examination and microscopic analysis revealed that all of the bullets found at the crime scene were fired from the *same* nine millimeter gun. Testimony showed that the magazine clips for this type of gun were capable of holding fifteen bullets apiece. A search of appellant's room in his mother's home revealed a gun box designed to house a nine millimeter gun. A gun belt appropriate for holstering such a gun was found in appellant's car. The gun was never found.

## II. GUILT/INNOCENCE

### A. Voir Dire Issues

■ In points of error four and five, appellant complains about the trial court's refusal to grant certain defense challenges for cause. Before an appellant can claim that he was harmed by a trial court's denial of a defense challenge for cause, the record must show that (1) he exhausted all of his peremptory challenges, (2) he requested more challenges, (3) his request was denied, and (4) he identified an objectionable person seated on the jury upon whom he would have exercised a peremptory challenge. *Anson v. State*, 959 S.W.2d 203, 204 (Tex.Crim.App.1997), *cert. dism'd*, 525 U.S. 924, 119 S.Ct. 290, 142 L.Ed.2d 241 (1998); *Broussard v. State*, 910 S.W.2d 952, 956–957 (Tex.Crim.App. 1995), *cert. denied*, 519 U.S. 826, 117 S.Ct. 87, 136 L.Ed.2d 44 (1996). The record shows that appellant exercised his fifteenth and final peremptory challenge on prospective juror King. The next prospective juror, Felan, was accepted by appellant and became the twelfth member of the jury. Appellant did not ask for additional peremptory challenges. Under these circumstances, appellant was not harmed by the denial of his challenges for cause. Points of error four and five are overruled.

### B. Motions to Suppress

#### 1. *Search of the Mother's Home*

■ In point of error one, appellant contends that the trial court erred in denying his motion to suppress the fruits of a police search of his mother's home. The claimed basis for the search was that appellant's mother consented to the search. Appellant challenges this basis for the search on two grounds. First, he claims that his mother's consent was not voluntary. Second, he claims that his mother had no authority to consent to the search of his room. Neither of these claims were made in appellant's motion to suppress. The motion simply alleged that the search "was conducted without consent, without a valid warrant, without probable cause" in violation of the Fourth Amendment and

Article I § 9 of the Texas Constitution.[3] Moreover, appellant advanced no argument before the trial court on the issues he now advances on appeal.

Appellant has procedurally defaulted his argument that his mother lacked the authority to consent to a search of his room. A party's objection must state the grounds for ruling with "sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." Tex.R.App. P. 33.1. The mother's ownership of the house was at least *prima facie* evidence of her authority to allow law enforcement agents to search her home. The fact that appellant is an adult who resided in a room in that home does not necessarily negate his mother's authority to consent to a search of that room. *See Sorensen v. State*, 478 S.W.2d 532, 533–534 (Tex.Crim. App.1972) (mother in that case had authority to consent to a search of the adult defendant's room). The focus of appellant's motion and the pretrial hearing was on whether consent actually occurred, not on whether someone had the authority to consent. From this record, we cannot conclude that the trial court was made aware that appellant was contesting his mother's authority to consent to a search.

■■■ We shall assume, without deciding, that appellant's claim at trial that there was no consent fairly encompasses his claim on appeal that his mother's consent was not voluntary; we will address the merits of the voluntariness issue. We review the record at a motion to suppress hearing under a mixed standard: (1) the historical facts and any application of law to fact questions that turn on an evaluation of credibility and demeanor are viewed in the light most favorable to the trial court's ruling, and (2) application of law to fact questions that do not turn upon an evalua-

tion of credibility and demeanor are reviewed *de novo*. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). The record, viewing the historical facts in the light most favorable to the trial court's ruling, shows the following: Appellant lived in his mother's home and had his own room. Police officers came to the home and asked appellant's mother for consent to search appellant's room. Appellant's mother gave oral consent but refused to sign a written consent form. She was told by one of the officers that she did not have to allow a search, but she told the officers "Go ahead." No threats of any kind were made, and officers testified that they had no reason to believe that appellant's mother's consent to search was not voluntary.

■■■ This evidence is sufficient to show that the mother's consent was voluntary. Testimony that a person gave consent after being warned of the right to refuse consent is some evidence that the consent was voluntary. *Allridge v. State*, 850 S.W.2d 471, 492 (Tex.Crim.App.1991), *cert. denied*, 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993). Testimony by law enforcement officers that no coercion was involved in obtaining the consent is also evidence of the consent's voluntary nature. *Id.*

Appellant's mother and sister testified that the officers were never given permission to search appellant's room. But the trial court was free to disregard this testimony and believe the police officers. *Id.*; *Guzman*, 955 S.W.2d at 89. Point of error one is overruled.

### 2. *Search of Appellant's Car*

■■■ In point of error two, appellant contends that the trial court erred in overruling his motion to suppress evidence obtained from his car. In his motion and on appeal, appellant alleges that law enforce-

---

**3.** Appellant cites caselaw indicating that Article I § 9 confers more protection than the Fourth Amendment in requiring that voluntary consent be shown by clear and convincing evidence rather than a mere preponder-

ance. *See State v. Ibarra*, 953 S.W.2d 242, 244–245 (Tex.Crim.App.1997). Accordingly, we review appellant's claims in light of the more protective state standard.

ment authorities obtained a gun belt from his car in violation of the Fourth Amendment and of Article 18.10.

Police discovered a grey, four-door, Mitsubishi automobile in Del Rio, and a license check revealed that appellant was one of the registered owners. H.M. Atchison, a detective with the Brazoria County Sheriff's Office, relayed to Don Weaver, an officer with the Del Rio police department, information from which . Officer Weaver drafted a search warrant and probable cause affidavit. The search warrant was approved by a magistrate in Val Verde County. The probable cause affidavit described the car in question as a "1990 Mitsubishi four door automobile, grey in color, bearing Texas license plate DNF–93C, vehicle identification number JA3CU26X0LU005115." The affidavit mentioned the location of the car in Del Rio and stated that appellant was one of the registered owners of the vehicle. The affidavit also related the basis for believing the automobile contained evidence of a crime:

> A woman named Sherry Graves, d/o/b/ 12–23–54, observed Virgil Martinez driving the said automobile. She stated in a voluntary statement to the Brazoria County Sheriff's Department that she observed Virgil Martinez drive the said automobile to the scene of the crime and she watched as Virgil Martinez shot Veronica Fuentes and John Gomez.

The affidavit listed a number of items that were expected to be found in the car, including a gun belt.

Consistent with statements in the probable cause affidavit, appellant's car was parked in Del Rio on a public street, in front of a slaughterhouse. With the warrant in hand, on October 11, 1996, at around 11:45 p.m., officers went out to the car. One of the police officers shone a flashlight at and looked through one of the windows of the car. He saw a gun belt on the rear passenger floorboard, and a switchblade knife was seen in the center console between the front two seats. The car was then towed by a wrecker service. The vehicle was later inventoried, and on October 12, 1996, the gun belt was taken to Brazoria County. Later, the gun belt was delivered to a laboratory for scientific testing. On March 6, 1997, a Val Verde County magistrate issued an order authorizing the removal of the gun belt from Val Verde County.

During the motion to suppress hearing, Graves testified that she did not describe the car appellant was driving at the time of the murder. When asked what car appellant usually drives, she described the car as a grey, four-door car. But she never described appellant's car by its make, year, license plate number, or vehicle identification number. Detective Atchison admitted that Graves did not supply all the information about the car that was attributed to her in the probable cause affidavit. Atchison stated that the misstatements in the affidavit were probably his mistake.

Appellant argued to the trial court that the misstatements in the probable cause affidavit were knowing falsehoods that rendered the search warrant invalid under *Franks v. Delaware*.[4] The State defended the search warrant but also argued that the gun belt was properly seized under the "plain view seizure" doctrine. The trial court granted appellant's motion to suppress as to all evidence found in the car *except* the gun belt. During the hearing, the trial court said that appellant's argument on the plain view seizure issue did not "hold[ ] water."

On appeal, appellant contends that the warrant is invalid and that the plain view seizure doctrine does not apply. The State responds with three arguments: (1) the probable cause affidavit contains enough information to justify issuance of the warrant even after the inaccuracies are excised, (2) the gun belt was properly seized under the plain view seizure doctrine, and (3) appellant's automobile was abandoned,

4. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

so appellant no longer had an expectation of privacy in it or its contents. We agree with the State that the gun belt was properly obtained under the plain view seizure doctrine.[5]

■ The plain view seizure doctrine requires a two-prong showing: (1) that law enforcement officials see an item in plain view at a vantage point where they have the right to be, and (2) it is immediately apparent that the item seized constitutes evidence—that is, there is probable cause to associate the item with criminal activity. *Ramos v. State*, 934 S.W.2d 358, 365 (Tex. Crim.App.1996), *cert. denied*, 520 U.S. 1198, 117 S.Ct. 1556, 137 L.Ed.2d 704 (1997). Appellant concedes that the officers satisfied the first prong—that they were lawfully in a position to observe the gun belt in plain view. He contends only that it was not immediately apparent at the time that the gun belt constituted evidence of a crime. We disagree.

Law enforcement officers knew from a license check that appellant was one of the registered owners of the 1990 Mitsubishi. The Mitsubishi also matched Graves' general description of a grey, four-door car that she had seen appellant drive. The officers were also armed with the knowledge that an eyewitness had identified appellant as the shooter of at least two of the victims of the crime in question, and so, he used a *gun*, which might have a matching gun belt. And, the car's being found in Del Rio was evidence that appellant had used the vehicle to flee. Knowing all of those facts, the officers had probable cause to believe that the gun belt found in appellant's car was associated with criminal activity. Indeed, under those facts, the officers had probable cause to believe that the car itself was associated with criminal activity, and they were justified, not merely in retrieving the gun belt, but also in seizing the car and all of its contents.

■ Appellant also argues that the gun belt should be excluded from evidence due to a violation of Article 18.10. Article 18.10 sets forth the procedures for returning a search warrant and disposing of property that has been seized:

> Upon returning the search warrant, the officer shall state on the back of the same, or on some paper attached to it, the manner in which it has been executed and shall likewise deliver to the magistrate a copy of the inventory of the property taken into his possession under the warrant. The officer who seized the property shall retain custody of it until the magistrate issues an order directing the manner of safekeeping the property. *The property may not be removed from the county in which it was seized without an order approving the removal, issued by a magistrate in the county in which the warrant was issued; provided, however, nothing herein shall prevent the officer, or his department, from forwarding any item or items seized to a laboratory for scientific analysis.*

(Emphasis added). Appellant contends that officers violated Article 18.10 by removing property from Val Verde County to Brazoria County without prior approval from a Val Verde County magistrate. Appellant further contends that this alleged violation of Article 18.10 triggers Article 38.23's provisions, requiring evidence obtained in violation of the law to be excluded. The State advances three responses: (1) the removal of the evidence meets the "scientific testing exception" contained in Article 18.10, (2) the Val Verde County magistrate's order of March 6, 1997 retroactively cured any noncompliance with Article 18.10, and (3) any error was harmless under Tex.R.App. P. 44.2(b).

We need not address the State's arguments regarding the intricacies of complying with Article 18.10 or the harm that might be caused by a failure to comply

---

5. Consequently, we need not address, and express no opinion about, the other arguments

made by the parties.

because we find that Article 38.23 does not apply to violations of Article 18.10. Article 38.23(a) requires the exclusion of evidence "obtained ... in violation of any provisions of the Constitution or laws of the State of Texas ...." (ellipses inserted). Article 18.10's requirement that property not be removed from the county applies only *after* the property has already been seized. The "obtaining" of a particular item of evidence is not a continuing act. That officers may move an item of evidence to an unauthorized location after it has been legally obtained does not vitiate the status of such evidence as having been legally obtained. Having found that the gun belt was legally obtained pursuant to a plain view seizure, we conclude that the removal of the gun belt from Val Verde County, even if unauthorized under Article 18.10, does not vitiate the status of that evidence as legally obtained. Point of error two is overruled.

## C. Evidence

### 1. *John Gomez's Character*

In points of error six and seven, appellant contends that the trial court erred in excluding evidence of John Gomez's history of violence and mental illness. Appellant outlines testimony elicited in bills of exception from two witnesses: Joe Castro, Gomez's uncle, and Juanita Gomez, Gomez's grandmother. Appellant does not point to a particular rule of evidence authorizing this testimony; instead, he merely claims that the State "opened the door" to this evidence.

Initially, we observe that appellant has failed to preserve his claim as to Castro's testimony. After Castro was questioned outside the presence of the jury, the trial court ordered a recess. After the recess, the trial court deferred its ruling:

Counsel, in reference to the request by the defense to question the witness Castro in reference to Mr. Gomez, I'm going to hold my ruling in abeyance and allow you, at a later date, at a later time in this trial, if you call it to my attention, I will determine whether or not I will allow it at that time. But at the present time, I am not overruling, I'm not granting the State's objection they have to it. But I'm not going to allow it at this point in time.

Appellant objected to the trial court's "not making a ruling at this time."

After the State rested, appellant reminded the trial court of appellant's wish to introduce evidence of Gomez's character for violence. The trial was recessed for the weekend. On Monday, the trial court asked defense counsel what character evidence he wanted to offer regarding Gomez. The trial court stated that it would not allow in juvenile records but would allow appellant to question witnesses, including Castro. Defense counsel responded that the testimony would probably come in through Juanita. Defense counsel made no subsequent attempt to introduce Castro's testimony about Gomez's character.

To preserve error on appeal, a party must obtain a ruling from the trial court or object to the trial court's refusal to rule. Tex.R.App. P. 33.1(a)(2)(A) & (B). The trial court never ruled on the admissibility of Castro's testimony. Although appellant objected to the trial court's refusal to rule at the time,[6] after the State rested, the trial court gave appellant the opportunity to introduce Castro's testimony. Error with respect to Castro's testimony has not been preserved for review.

Appellant did properly preserve his claim with respect to Juanita's testimony by eliciting her proposed testimony outside the presence of the jury and obtaining a ruling excluding the evidence. We turn, then, to the merits of his claim with respect to her proposed testimony.

---

**6.** Here, the trial court postponed its ruling and promised to rule at a later point in trial. Due to subsequent events, we need not address whether or not this postponement amounts to a "refusal to rule" that would preserve error under Rule 33.1.

In his brief, appellant claims that the following testimony was improperly excluded (paraphrased and numbering inserted):

(1) Juanita denied that she had applied to have her grandson, John Gomez, committed to Harris County Psychiatric Hospital, although she admitted requesting that he receive psychiatric treatment.

(2) She denied that she had stated in a sworn pleading that her grandson had hurt people and would do it again because he would not take his medication.

(3) She acknowledged that her grandson was committed to the Harris County Psychiatric Hospital and that he had been on medication for several years.

(4) She did not know whether her grandson was committed because he would become physically aggressive with other people.

(5) She acknowledged that she had sought temporary health services for her grandson.

(6) She acknowledged that a defense exhibit reflected that her grandson had been suspended for three days for hitting a girl at school.

 Character evidence is ordinarily inadmissible. Tex.R. Evid. 404(a). The defendant is permitted to introduce evidence of a pertinent character trait of the alleged victim of the offense on trial. Rule 404(a)(2). But, such evidence may only take the form of reputation or opinion testimony. Rule 405(a). Items (1), (3), (5), and (6) do not constitute reputation or opinion testimony. Item (4) involves a question that, arguably, might encompass opinion testimony, but the answer does not, as the witness stated she did not

know. Item (2) arguably involves an opinion about character but that opinion, expressed in a legal pleading, was hearsay. *See* Tex.R. Evid. 801 & 802. Juanita was never asked for her opinion as to whether Gomez was a violent person. Nor was she asked whether Gomez had a reputation for being a violent person.[7]

 The sole reason advanced by appellant for admitting this testimony is that the State opened the door to this evidence with the following question and answer from Castro:

Q. Did he [John Gomez] take care of anyone, there, at that residence?

A. He took care of my mom and his mother.[8]

Appellant contends that this testimony created a false impression that "Gomez had never been involved in aggressive and assaultive behavior with his family members" and that appellant was entitled to rebut this "false impression" with Gomez's history of violence and mental illness.

This relatively innocuous testimony does not open the door to the presentation of specific instances of violent conduct or of Gomez's history of mental health treatment. That Gomez took care of family members is hardly evidence of peaceable character. Taking care of a family member does not, in itself, reveal any information about whether the caregiver is peaceful or violent towards those in his care— much less towards others who are not even family members. But even if we were to find that this evidence had some small tendency to falsely confer an impression of peaceful character, the trial court would be well within its discretion in excluding appellant's evidence under Tex.R. Evid. 403.[9]

7. In his brief, appellant also states that John Gomez's mental health records were included in his offer of proof. However, aside from the testimony above, appellant does not point to portions of the records he wished to introduce, what those portions would have said about Gomez's character, or why they would be admissible.

8. The record indicates that Gomez's mother has Down's Syndrome.

9. Rule 403 provides:
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay,

Points of error six and seven are overruled.

## 2. *Keith Burrow's Character*

■ In points of error nine and ten, appellant complains that the trial court erred in refusing to permit defense counsel to impeach Keith Burrow with prior extraneous offenses. Appellant claims that he should have been allowed to cross-examine Burrow regarding two events: (1) Burrow's giving a false name after an arrest, and (2) Burrow's shooting his stepfather. Neither of these alleged offenses resulted in a conviction. Appellant claims the extraneous offenses are admissible under Texas Rules of Evidence 401 and 611(b).

Rule 401 defines "relevant evidence," and Rule 611(b) provides that "A witness may be cross-examined on any matter relevant to any issue in the case, including credibility." These rules allow a party to introduce relevant evidence, including evidence regarding credibility, so long as there is no other rule requiring exclusion. In the present case, there is another rule that requires exclusion of the evidence— Texas Rule of Evidence 608.

Rule 608 limits the ability of a party to introduce evidence regarding the character of a witness. "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of a crime as provided in Rule 609, may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence." Rule 608(b). The evidence appellant wished to offer did indeed constitute specific instances of conduct but were not prior convictions under Rule 609. The trial court properly excluded the evidence. Points of error nine and ten are overruled.

## 3. *Veronica's Out–of–Court Statement*

■ In point of error eleven, appellant contends that the trial court erroneously admitted, in violation of the hearsay rule,

or needless presentation of cumulative evidence.

Graves' testimony that Veronica told her three weeks before the offense that she (Veronica) was afraid of a man named Virgil, and if anyone saw him, to call the sheriff's department. Appellant contends on appeal that the evidence was inadmissible hearsay. We disagree.

"Hearsay" is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Texas Rule of Evidence 801(d). If an item of evidence fails to meet this definition, then it is not hearsay. There are also hearsay exceptions, for items of evidence which meet the definition of hearsay but are nevertheless admissible. One exception to the hearsay rule is the declarant's then existing mental or emotional condition:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Texas Rule of Evidence 803(3).

■ There are two aspects of Graves' testimony: (1) Veronica's statement that she was afraid of appellant, and (2) Veronica's plea to Graves to call the sheriff if anyone saw appellant. Veronica's statement that she was afraid of appellant was a statement of the declarant's then existing state of mind, and therefore fell within the Rule 803(3) hearsay exception. Her request to call the sheriff's office, even if it may be characterized as a "verbal expression" under Rule 801(a), was not hearsay. The request was not admitted to show that the sheriff's office was called, but was admitted to show Veronica's fear of appellant. Point of error eleven is overruled.

## 4. *Gomez's Out–of–Court Statement*

■ In point of error twelve, appellant contends that the trial court erroneously

dence.

admitted, in violation of the hearsay rule, Sergeant Tolson's testimony that Gomez identified the shooter as "Ex-boyfriend." Appellant contends that the statement does not meet the requirements for an "excited utterance" under Rule 803(2). We need not address whether the statement is an excited utterance, however, because Gomez's statement clearly qualifies as a dying declaration. A statement meets the dying declaration exception to the hearsay rule if the declarant is unavailable at the time of trial and the statement is "[a] statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death." Rule 804(b)(2). Gomez was unavailable at trial because he was dead. Rule 804(a)(4). A declarant's belief that death was imminent "may be inferred from the circumstances of the case, such as the nature of the injury, medical opinions stated to him, or his conduct." *Thomas v. State*, 699 S.W.2d 845, 853 (Tex.Crim.App.1985). Gomez's statement was made after he had been shot seven times—from which he never recovered—and his statement concerned the identity of the perpetrator. Given the severity of Gomez's injuries and the manner in which they occurred, the circumstances were sufficient for the trial court to have inferred that Gomez believed his death was imminent. The trial court did not abuse its discretion in admitting the evidence. Point of error twelve is overruled.

### 5. *Phone Calls*

In points of error thirteen and fourteen, appellant contends that the trial court erroneously denied his motions for mistrial after sustaining his objections to testimony about phone calls.[10] During the State's direct examination of appellant's mother, the prosecutor asked: "Did you know back on October 1st of 1996 that Veronica's phone was blocked from receiving phone calls from your phone?" Appel-

lant objected that the question assumed facts not in evidence. The trial court sustained the objection and instructed the jury to disregard the question. Appellant's motion for mistrial was denied. Later, during the State's direct examination of Veronica's mother-in-law, the following colloquy occurred:

Q. State whether or not, if it's within your personal knowledge, that your daughter ever hung up the phone—daughter-in-law ever hung up the phone on Virgil Martinez.

[DEFENSE COUNSEL]: Your Honor, objection. Leading, alleged extraneous matters.

THE COURT: Overruled. Let's get the answer.

Q. You may answer.

A. Yes. She would hang up on him.

Q. How did you know she was hanging up on Virgil Martinez?

A. I would ask her, who was that you hung up on.

[DEFENSE COUNSEL]: Your Honor, object to hearsay at this point in time.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Ask that the jury be instructed to disregard.

THE COURT: Members of the jury, you're instructed to disregard the last question by the prosecutor and the partial answer by the witness.

[DEFENSE COUNSEL]: Your Honor, at this time we would move for a mistrial.

THE COURT: Denied.

"Ordinarily, a prompt instruction to disregard will cure error associated with an improper question and answer." *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex.Crim.App. 2000). We see nothing in the record before us to suggest that the questions and answers provided here were of such a nature that they could not be cured by an

10. These two points are consolidated for argument in appellant's brief.

instruction to disregard.[11] Points of error thirteen and fourteen are overruled.

### D. Lesser offense

■ In point of error eight, appellant contends that the trial court erred in refusing to give his requested instruction on the lesser offense of murder. Despite the forensic evidence showing that all four victims were shot with the same gun, the eyewitness testimony that appellant shot *both* Veronica and Gomez, and the evidence—both direct and circumstantial—showing that appellant wore a gun holster on the night of the killings, appellant claims that the following scenario was raised by evidence presented at trial: that Veronica shot the children, that she subsequently shot Gomez, and that afterwards, appellant shot Veronica. Appellant bases this claim on three things: (1) Gomez's statement to Graves, "Veronica's gone crazy. Gun at kids' heads," (2) what appellant perceives to be an admission by Graves in the 911 call that she had no knowledge of whether anyone had been shot,[12] and (3) the fact that Graves never told the 911 dispatcher that she had seen appellant shoot Gomez or Veronica.

Even if we assumed that appellant's interpretation of the facts was rational and that those facts raised the lesser included offense of murder,[13] any error in that regard was harmless. The jury delivered *three* guilty verdicts, each on a separate count for capital murder: (1) murdering Veronica and Gomez during the same transaction, (2) murdering Joshua, a child under the age of six, and (3) murdering Cassandra, a child under the age of six. One death sentence was assessed, based upon the three counts. Only count one is susceptible to the lesser included-offense theory advanced here—appellant could be guilty of non-capital murder as to count one if he killed Veronica or Gomez but not

11. The trial court's instruction to disregard applied only to the prosecutor's last question and the witness' answer concerning how Veronica's mother-in-law knew that Veronica hung up the phone on appellant. But that question and answer suggests that the previous question and answer—that Veronica hung up the phone on appellant—may have been based solely upon hearsay. Assuming *arguendo* that this testimony was in fact inadmissible hearsay, appellant failed to preserve error. That appellant failed to contemporaneously object on hearsay grounds to this previous question and answer may be excusable, since the prosecutor's question was not obviously designed to elicit hearsay testimony. But, once the hearsay problem with the previous testimony became apparent, appellant was required to object and request curative action to preserve error. Tex.R.App. P. 33.1; *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex.Crim.App. 1996), *cert. denied*, 520 U.S. 1173, 117 S.Ct. 1442, 137 L.Ed.2d 548 (1997)(party must procure an adverse ruling to preserve error); *Fuller v. State*, 829 S.W.2d 191, 198–199 (Tex.Crim.App.1992)(plurality opinion), *cert. denied*, 508 U.S. 941, 113 S.Ct. 2418, 124 L.Ed.2d 640 (1993)(if evidence that appears to be admissible at the time later turns out to be inadmissible, complaining party must move to strike evidence at the time its inadmissibility becomes apparent). Appellant failed to request any curative action for this previous testimony.

12. When the 911 dispatcher asked Graves if anyone had been shot, Graves replied that she did not know and did not want to go outside to find out. At trial, Graves testified that she thought the dispatcher was talking about the children.

13. Appellant's proposed scenario is, at best, unlikely given the pattern of gunfire present on the 911 tape. While Graves conversed with Gomez, what appear to be muffled shots can be heard on the tape. These shots may have occurred when the two children were killed in the trailer. About 10 seconds after Graves' last comment to Gomez, a rapid round of twelve to fifteen gunshots can be heard. Shortly thereafter, a rapid round of approximately seven gunshots can be heard on the tape. This third round of gunshots would appear to be insufficient to create the ten to twelve gunshot wounds suffered by Veronica. Rather, Veronica's wounds were consistent with the second round of gunshots. The pattern of gunshots on the 911 tape indicates that Veronica was shot before Gomez, and after being shot, she would be incapable of shooting anyone. Add to the 911 evidence the fact that the bullets in all the victims came from the same gun and that appellant wore a gun holster that night, and appellant's theory of multiple shooters seems even more implausible.

both. Counts two and three, each requiring only one victim, are not susceptible to appellant's lesser-included offense theory, and each of the latter two counts, alone, is sufficient to support a death sentence. Moreover, the jury's verdicts on counts two and three show that the jury did not believe the lesser-included offense scenario appellant now advances. Point of error eight is overruled.

### E. Jury Argument

■ In point of error fifteen, appellant complains about the trial court's refusal to grant a mistrial after sustaining a defense objection to a statement made by the prosecutor during argument. The prosecutor argued:

> Veronica's not here to tell you the reason why she was afraid and why the police called. But there's evidence before you, she is afraid. And I tell you, common sense dictates, common knowledge that sometimes, spurned lovers kill the other person, particularly, when they come in and, perhaps, see her with another person.

Defense counsel objected: "Object to this. He's arguing outside the record. Not in the evidence." The trial court sustained the objection and instructed the jury to disregard the prosecutor's last statement. Appellant's motion for mistrial was denied.

■ Even when the prosecutor mentions facts outside the record during argument, an instruction to disregard will generally cure the error. *Guidry v. State*, 9 S.W.3d 133, 154 (Tex.Crim.App.1999). Assuming, without deciding, that the prosecutor's argument was improper, that argument was not so extreme as to render ineffective an instruction to disregard. Accordingly, we find that the trial court's instruction to disregard cured any error. Point of error fifteen is overruled.

## III. PUNISHMENT

### A. Parole

In points of error three and sixteen, appellant complains about the trial court's refusal to permit the jurors to be informed, during voir dire and in jury instructions, that a capital murder defendant who receives a life sentence will not be eligible for parole for forty years. We have consistently decided this issue adversely to appellant's position, and appellant makes no novel argument that would persuade us to deviate from our precedent. *Dewberry v. State*, 4 S.W.3d 735, 756 (Tex. Crim.App.1999); *Griffith v. State*, 983 S.W.2d 282, 289 (Tex.Crim.App.1998), *cert. denied*, —— U.S. ——, 120 S.Ct. 77, 145 L.Ed.2d 65 (1999). Points of error three and sixteen are overruled.

### B. Voluntary Intoxication

■ In point of error seventeen, appellant contends that the trial court erred in refusing to submit in the punishment phase jury charge an instruction on voluntary intoxication as a mitigating factor. Appellant cites evidence presented in the punishment phase that he had admitted to consuming alcohol, PCP, and cocaine before he was picked up by the authorities, and that a psychiatrist subsequently prescribed for him Haldol, an anti-psychotic drug. But no evidence was presented that appellant used these drugs at or before the time of the offense or that he was intoxicated at the time of the offense. Absent such evidence, appellant was not entitled to a charge on intoxication as a mitigating factor.[14] *Rodriguez v. State*, 899 S.W.2d

---

14. A defendant is entitled to a mitigation instruction on intoxication in the punishment phase of a trial if there is evidence of temporary insanity caused by intoxication:

> (b) Evidence of temporary insanity caused by intoxication may be introduced by the actor in mitigation of the penalty attached to the offense for which he is being tried.

> (c) When temporary insanity is relied upon as a defense and the evidence tends to show that such insanity was caused by intoxication, the court shall charge the jury in accordance with the provisions of this section.

Texas Penal Code § 8.04(b) & (c).

658, 668 (Tex.Crim.App.), *cert. denied,* 516 U.S. 946, 116 S.Ct. 385, 133 L.Ed.2d 307 (1995). Point of error seventeen is overruled.

■ In points of error eighteen and nineteen, appellant contends that the trial court erred in overruling his objections to State's arguments involving matters outside the record. Appellant's complaint involves the following colloquies:

PROSECUTOR: And based on this evidence, this—this rates as one of the worst crimes, one of the worst killings not only in Brazoria County but the State of Texas.

DEFENSE COUNSEL: Objection, your honor. That's not in the record.

THE COURT: Stay in the record, counsel.

PROSECUTOR: The evidence shows you, these were execution killings. 26 to 28 bullets. The family of the murdered victims, the family—the victims themselves, they cry out to you, for the death penalty in this case. There's no more—

DEFENSE COUNSEL: Objection, your Honor. Not in the record, either. Absolutely no evidence of that.

THE COURT: Overruled.

PROSECUTOR: Justice in this case requires you, because we told you from day-one, what we wanted was a fair jury, a jury that would do justice in this case.

. . . .

You know, think about the nurses in the penitentiary. Think about the secretaries. Think about the guards.

DEFENSE COUNSEL: Objection, your Honor. Nothing in the record about nurses and secretaries.

THE COURT: Overruled.

PROSECUTOR: Think about the other people this defendant is going to come into contact with. Think about the other people that you can protect by giving the death penalty in this case.

There are two prosecutorial comments that appellant claims are outside the record: (1) that the victims and their families cry out for the death penalty, and (2) that prisons are staffed by nurses and secretaries. Appellant is correct that neither of those items appear in the record, but the comments can arguably be justified on other grounds: comment (1) as a plea for law enforcement and comment (2) as a statement of matters within the realm of common knowledge. *See Guidry,* 9 S.W.3d at 154 (Tex.Crim.App.1999)(pleas for law enforcement permissible); *Nenno v. State,* 970 S.W.2d 549, 559 (Tex.Crim.App.1998) (common knowledge is an exception to the prohibition against arguing facts outside the record). However, we will assume, without deciding, that the comments are not covered by these arguable justifications, and address the issue of harm.

The first question is whether to assess harm under the standard for constitutional errors or for nonconstitutional errors. For arguments that strike over the shoulders of counsel, we have held that the harm standard for nonconstitutional errors—found in Texas Rule of Appellate Procedure 44.2(b)—applies. *Mosley v. State,* 983 S.W.2d 249, 259 (Tex.Crim.App. 1998), *cert. denied,* 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999). *Mosley's* holding suggests that most comments that fall outside the areas of permissible argument will be considered to be error of the nonconstitutional variety. Comments upon matters outside the record, while outside the permissible areas of jury argument, do not appear to raise any unique concerns that would require us to assign constitutional status. We shall therefore apply the standard of harm for nonconstitutional errors.

■ Rule 44.2(b) provides that a nonconstitutional error "that does not affect substantial rights must be disregarded." In *Mosley,* we held that determining harm under that standard in improper argument cases requires balancing the following

three factors: (1) severity of the misconduct (prejudicial effect), (2) curative measures, (3) the certainty of conviction absent the misconduct. *Id.* Appellant argues that this test applies to punishment, except that the third factor would involve the certainty of "the punishment assessed." We agree that the *Mosley* test would apply to punishment, at least in a capital case, with the third factor so modified. We proceed to analyze the comments under the *Mosley* factors.

The degree of misconduct, if any, was relatively mild in the present case. The prosecutor's comment that the victims and their families cry out for the death penalty appears to be intended as a plea for law enforcement. The jury was in a position to know that victims who are dead cannot presently cry out for the death penalty, and that, given the facts surrounding their deaths, no such cries were made before they died. Nor would the jurors be surprised to hear that the victims' families would be upset with appellant or that they would want retribution. And the prosecutor did not attempt, through this argument, to convey any specific facts about the effect of the victims' deaths upon their families. Instead, the prosecutor was pleading with the jury to give the death penalty because the record before the jury showed that the defendant deserved it. To the extent that the prosecutor conveyed facts outside the record, such facts had no tendency to adversely influence the jury against appellant beyond the influence exerted by a wholly legitimate plea for law enforcement.

The prosecutor's comment that appellant could be a threat to nurses and secretaries was also, at most, mildly improper. That prisons would employ personnel to treat medical problems and clerical workers to handle paperwork is a matter of common knowledge. Whether such persons would be nurses and secre-

taries or would be other personnel performing such functions is of little significance. The prosecutor's main point—that appellant would be a threat to non-prisoners in prison—was an entirely legitimate point to make. The first *Mosley* factor carries very little weight in the present case.

The second factor may be quickly dispensed with. There was no curative instruction, and the State did nothing to emphasize the allegedly erroneous comments made. The comments were a very small portion of the State's entire argument at punishment.

The third factor weighs heavily in the State's favor. Appellant's crime was especially egregious. He killed not just one, but four people, including two small children. The apparent motive for these killings was jealousy over an ex-girlfriend. A former girlfriend testified at the punishment stage that appellant had exhibited aberrant behavior after their relationship ended: calling her names when she broke the relationship off, subsequently leaving messages on her voice mail at work, and calling her at home numerous times after she told him not to call. She also testified about a disturbing incident in which appellant came into her house uninvited with pizza for her children, slammed his fist on her kitchen table while uttering profanities about someone he used to date, and finally stormed back out after being asked several times to leave. After his arrest appellant threatened hospital attendants with a heavy plastic table knife, and appellant was caught concealing a welding rod while being transported during trial. There was also evidence at trial that appellant had attempted to fake insanity after he was arrested for the present offense. This evidence shows a volatile, obsessive, and non-repentant individual who would resort to violence—even extreme violence—when his relationships with women did not work out.[15]

---

15. We note that the jury's verdict on punishment was delivered within an hour and a half

after deliberations began.

Given the mildness of the prosecutor's comments and the strength of the evidence supporting appellant's death sentence, we find that any errors associated with those comments were harmless. Points of error eighteen and nineteen are overruled.

The judgment of the trial court is affirmed.

WOMACK, J., filed a concurring opinion.

PRICE, HOLLAND, and JOHNSON, JJ., concurred in the result.

WOMACK, J., filed a concurring opinion.

I join the judgment of the court and, except as to points of error 18 and 19, its opinion. In my view there was no error as to those points, and therefore the issue of harmless error need not be reached.