

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1753-06

**ANN CAROLINE YORK, Appellant**

**v.**

**THE STATE OF TEXAS**

## ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE FOURTEENTH COURT OF APPEALS
## HARRIS COUNTY

**KELLER, P.J., filed a dissenting opinion in which KEASLER, and HERVEY, JJ., joined.**

Though the prosecutor repeated his improper arguments, which may have been moderately inappropriate, those arguments did not relate to the crucial issue in the case, the trial court sustained appellant's objections and gave instructions to disregard, and conviction was certain in any event. Under these circumstances I would hold that the trial court did not err in refusing to grant a mistrial.

In *Hawkins v. State*,[1] we essentially adopted, in the motion for mistrial context, *Mosley*'s[2]

---

[1] *Hawkins v. State*, 135 S.W.3d 72 (Tex. Crim. App. 2004).

[2] *Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998),

three-factor test for determining whether a prosecutor's argument constitutes reversible error.[3] We

consider:

> (1) severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks),
>
> (2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge), and
>
> (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction).[4]

In the motion for mistrial context, the ultimate question is "whether the refusal to grant the mistrial

was an abuse of discretion."[5] The analysis is conducted "in light of the trial court's curative

instruction."[6] "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be

required."[7]

The touchstone of the first *Mosley* factor is prejudice.[8] "[P]articularly offensive or

outrageous conduct generally gives rise to a natural inference of prejudice and can be considered as

such," but we must not assess the "severity" of a prosecutor's comments in isolation from the

question of whether the argument had a prejudicial effect.[9]

In *Mosley*, we found a "rabbit trail" comment to be "mildly inappropriate" because, at most,

---

[3] *Hawkins*, 135 S.W.3d at 77.

[4] *Mosley*, 983 S.W.2d at 259.

[5] *Hawkins*, 135 S.W.3d at 77.

[6] *Id*.

[7] *Id.*

[8] *Id.*

[9] *Id.* at 78.

it accused defense counsel of attempting to "distort the jury's view of the evidence through clever argument."[10] We pointed out that the comment did not directly accuse the defense attorney of lying and did not accuse him of manufacturing evidence.[11] In finding the severity of the misconduct to be relatively mild, we also observed that the comment did not inject new facts into the record and that the jury was "in a position to evaluate the truthfulness of the prosecutor's assertion."[12] And because the jury was in a position to evaluate the matter for itself, the prosecutor's comment could even backfire if the jury disagreed with the prosecutor's assessment of defense counsel's conduct.[13]

Unlike in *Hawkins*, where there was an "isolated" incident,[14] inappropriate comments were repeatedly interjected in this case. And the prosecutor's comments in this case rose beyond mild inappropriateness when he talked about defense counsel having taken the issue up in a different case on appeal and when he characterized defense counsel's conduct as "shameful." Indeed, the prosecutor's comment injected one new fact into the case – that defense counsel had taken the issue up in a previous case on appeal.

But the prosecutor's argument did not fall on the most severe end of the spectrum. Although he suggested that defense counsel used artful questioning to mislead the jury, the prosecutor did not accuse defense counsel of lying or manufacturing evidence. And while the jury could not evaluate for itself what happened in another case, it could evaluate whether the prosecutor was correct in

---

[10] 983 S.W.2d at 260.

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *See Hawkins*, 135 S.W.3d at 83.

saying that defense counsel was attempting to mislead the jurors into using a definition of "normal use of mental or physical faculties"[15] that was contrary to the jury charge. If the jury disagreed with the prosecutor's assessment of defense counsel's conduct during trial, then the prosecutor's argument could backfire into a loss of his own credibility with the jury.

Moreover, the prosecutor's comments were not aimed at defense counsel's conduct in general but at defense counsel's conduct with respect to a specific issue: the definition of "normal use." That specific issue was not the crucial issue in the case. As the Court points out, the most hotly contested issue was who the driver was. At trial appellant and Danna Love, who was the other occupant of the car, testified that Love was the driver, but at the scene appellant said she was the driver. I do not see any significant risk that defense counsel's comments regarding the meaning of "normal use" would adversely affect the jury's assessment of appellant's credibility on whether she was the driver. And if the jury had believed she was telling the truth when she said at trial that she was not the driver, then the issue of normal use would have become patently irrelevant. If the jury did not believe her trial testimony on the matter, then it would have serious problems with appellant's credibility that have nothing to do with defense counsel's conduct.

With respect to the second *Mosley* factor, it is undisputed that the trial court sustained every objection and issued instructions to disregard. We have sometimes said that a trial court puts an implied "stamp of judicial approval" on an argument when he overrules an objection to it.[16] The reverse applies when the trial judge sustains an argument and gives an instruction to disregard. We

---

[15] *See* TEX. PEN. CODE §49.01(2)(A).

[16] *Wilson v. State*, 938 S.W.2d 57, 62 (Tex. Crim. App. 1996); *Good v. State*, 723 S.W.2d 734, 738 (Tex. Crim. App. 1986).

ordinarily assume that an instruction to disregard cures any harm flowing from an error.[17] Beyond that general assumption, however, we can say in this case that the trial judge's curative actions encouraged the jury to infer that the prosecutor's attacks were baseless.

My strongest disagreement is with the Court's analysis of the third *Mosley* factor. Contrary to the Court's opinion, the evidence supporting the conviction was very strong. Appellant's DWI prosecution arose from a collision: While traffic was stopped at a red light at 5:40 in the afternoon, appellant's car rear-ended the complainant's car, causing $7000 worth of damage and pushing it into a third car. The complainant testified, "She hit me so hard I didn't realize I hit this guy in front of me." Both the complainant and the driver of the third car got out of their cars and approached appellant's car to find that she and her passenger were both still in the car. The complainant and the driver of the other car both identified appellant as the driver. The complainant further testified that he had seen appellant and her passenger in the car before appellant's car ran into him. Both the complainant and the driver of the third vehicle formed the opinion that appellant was intoxicated. The complainant testified that he smelled alcohol on appellant, and he testified that, from the way appellant acted, he knew "right away" that she was intoxicated. The complainant also saw appellant engage in rude and combative conduct toward the police officer at the scene – "shooting the finger" and using profanity. Moreover, the complainant noticed that appellant did not realize that she had struck his vehicle, thinking instead that she had struck the third vehicle and insisting that the damage caused to that vehicle was not significant. The defense did not cross-examine the complainant or the driver of the third car.

---

[17] *Martinez v. State*, 17 S.W.3d 677, 691 (Tex. Crim. App. 2000)("Even when the prosecutor mentions facts outside the record during argument, an instruction to disregard will generally cure the error").

To the first police officer who arrived at the scene, appellant admitted being the driver and to drinking one glass of wine, but then the number "went to two and just during lunch." Appellant smelled of alcohol, had a flush, reddish face and slightly bloodshot eyes, and her walking was not "perfectly straight and narrow." Despite the fact that it was 5:40 in the afternoon, appellant told the officer that she had just come from lunch. Appellant could not produce a driver's license when requested, she was combative (as described above), and the officer had to repeat his questions two or three times and even then could not get answers that were appropriate to the questions asked. Appellant became defensive when asked such basic questions as whether she had a driver's license or an insurance card. Although appellant recited the alphabet in a satisfactory manner, she utterly failed the "head tilt" test. The officer had to repeat directions for the head tilt five to ten times before appellant attempted to follow all the directions at the same time – standing with feet together, arms to the side, eyes closed, and head tilted for thirty seconds. Even then, appellant could not do all the requested actions together, and when asked if she wanted to continue with the field sobriety testing, she replied that she did not. During the encounter, the officer noticed that appellant tried to use her cell phone to take pictures of the rear end of the third vehicle which she assumed that she had hit, and he prevented her from doing so. The officer testified that he believed appellant was intoxicated.

Two hours after the accident, sobriety tests were conducted at the police station with mixed results. The officer performing tests formed the opinion that appellant was intoxicated. Appellant refused to take the breath test. Appellant also admitted to this officer that she was the driver of the car.

Appellant and Love testified that they met for lunch at 1:20 or 1:30 in the afternoon. They both testified that the lunch lasted for approximately three hours, and that during that time, they each

consumed two glasses of wine. Love testified that appellant had a nice car and she wanted to drive it, so appellant allowed her to do so. Appellant and Love both testified at trial that they switched places in the car after the accident because appellant was unsure whether her insurance would cover Love as the driver. Both testified that appellant lied to the police when she said she was the driver of the car. On cross-examination, Love testified that she had been friends with appellant for forty years. In response to leading questions, Love admitted that she was "here today" because she did not want to see appellant in trouble "at any cost."

The Court seizes on a portion of the prosecutor's closing argument in order to characterize the police testimony regarding impairment as "problematic." What the prosecutor said was that the officers' "training and [] knowledge of the law could have been a lot better." But the prosecutor was referring to peripheral matters that had little if any impact on the strength of the incriminating evidence in this case.[18] Immediately after commenting on the officers' training and knowledge of the law, the prosecutor said:

> Mr. Trichter did an excellent job on cross-examination; however, they're still the same people with their training and the normal observations that a lay person such as [the complainant] and [the third driver] can make; yet, not one, but four different witnesses saying intoxicated.

And the prosecutor was correct. Four different people concluded that appellant was intoxicated, and

---

[18] Defense counsel was able to show that the officer at the scene had no formal training in administering field sobriety tests and that the officer did not know, at the time he administered the head tilt test, the correct number of seconds that the certification manual requires for that test. The officer at the scene also could not remember exactly how he obtained appellant's driver's license and social security numbers, except to say that he was never in fact shown a driver's license. And he had difficulty stating whether or not appellant had been arrested when she was taken to the station. The officer at the station knew the correct number of seconds for administering the head tilt test but did not know the number of seconds leeway the certification manual allows for successfully completing the test. Defense counsel was also able to show that the officer at the station administered the one-leg-stand test for a longer period than the guidelines allowed.

her behavior at the scene of the accident strongly supports that conclusion. So the prosecutor's quibbling with defense counsel over the definition of "normal use" did not have any impact in this case.

I respectfully dissent.

Filed: July 2, 2008
Do Not Publish