

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-14-00775-CR

Gilbert M. **ZEPEDA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 175th Judicial District Court, Bexar County, Texas
Trial Court No. 2012CR5264
Honorable Pat Priest, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:        Sandee Bryan Marion, Chief Justice
                Karen Angelini, Justice
                Jason Pulliam, Justice

Delivered and Filed:  November 4, 2015

AFFIRMED

A jury convicted Gilbert M. Zepeda of four counts of aggravated sexual assault of a child, one count of sexual assault of a child, and ten counts of indecency with a child by contact. In one issue, Zepeda argues the trial court erred in overruling his objection to improper jury argument, and the error affected his substantial rights. We conclude Zepeda's substantial rights were not affected, and affirm the trial court's judgments.[1]

---

[1]The trial court signed a separate judgment for each offense.

**BACKGROUND**

Zepeda was charged by indictment with four counts of aggravated sexual assault of a child, one count of sexual assault of a child, and ten counts of indecency with a child by contact. The child was Zepeda's step-daughter, S.D. Zepeda pled not guilty, and the case was tried before a jury.

The State's main witness at trial was the complainant, S.D., who was twenty years old at the time of trial. S.D. testified that Zepeda, on multiple occasions, touched her breasts and genitals, penetrated her vagina with his fingers, and made her touch his penis. The abuse began when S.D. was ten years old and ended when she was fifteen years old. When S.D. was fifteen, she told her mother and her two siblings about the abuse. S.D. did not tell her mother earlier because Zepeda had told her not to do so because her mother was happy. Because S.D. believed her mother was happy with Zepeda, she did not report the abuse.

In her testimony, S.D. recalled the day that she told her mother and her siblings about the abuse. The night before, S.D. had broken one of her mother's rules. Because her mother had found out, S.D. was in trouble. During the argument between S.D. and her mother, her mother kept asking S.D. if she, as a parent, had done something wrong. This prompted S.D. to tell her mother that Zepeda had been "touching" her. S.D.'s older brother overheard the conversation, and it made him angry at Zepeda. S.D.'s brother drove off to confront Zepeda, who was not living with them at the time. S.D., her mother, and her sister followed her brother in a separate car. In the car, S.D. provided her mother with more details. S.D.'s mother called the police as they drove to Zepeda's house. When they arrived at Zepeda's house, S.D. saw her brother arguing with Zepeda. The police arrived quickly, and S.D. and her mother went to the police station. At the police station, S.D. gave a statement in which she provided additional details to a detective.

S.D.'s mother, C.C., also testified on behalf of the State. C.C. testified that immediately after S.D. told her about the abuse, C.C.'s son went to confront Zepeda, and she and her daughters followed him. When C.C. told Zepeda that S.D. had accused him of sexual abuse, Zepeda responded by saying that C.C. did not know half the stuff her kids did, and that someone else was "fingering" S.D., and S.D. liked it.

C.C. also testified about her relationship with Zepeda. C.C. had met Zepeda about eleven years before trial, when S.D. was nine years old. Zepeda was one of her son's coaches. At the time, C.C. was married to S.D.'s father, but they were separated. C.C. and Zepeda became friends, and then became involved romantically. Eventually, Zepeda moved into C.C.'s home. C.C. and S.D.'s father divorced, and C.C. and Zepeda married. During their marriage, C.C. and Zepeda had financial troubles and the family moved multiple times. Also, C.C. and Zepeda separated several times. C.C. acknowledged that it was a difficult time, but she represented to her children that everything was fine and tried to be strong. By the time the case went to trial, C.C. and Zepeda had been divorced for several years.

The defense called several witnesses to testify. Among these witnesses was Zepeda's daughter who sometimes lived with Zepeda, C.C., and C.C.'s children. Zepeda's daughter testified that she and S.D. were pretty close, almost like sisters. According to Zepeda's daughter, S.D. was afraid of her mother and would lie to her mother in order to get out of trouble.

Another defense witness was Patricia Valero. Valero testified that her family owned a house that she had rented to C.C. about six or seven years ago. Valero's standard practice was to collect a security deposit, and the first and last month's rent. In C.C.'s case, however, Valero waived these requirements because C.C. told her that her husband had beaten her and sexually

abused her children.[2] This made Valero sympathetic to C.C.'s situation. C.C. lived in Valero's house for about four months, but neglected to pay any rent. Valero once confronted Zepeda about C.C.'s failure to pay rent, but the rent was never paid.

Zepeda testified on his own behalf at trial. According to Zepeda, C.C. lied about many things in her trial testimony. C.C. did not tell him she was married until after they had become romantically involved. Zepeda and C.C. married shortly after C.C. divorced S.D.'s father. Zepeda described a tumultuous relationship with C.C. They were married for five years, and moved many times. Sometimes they would live apart and sometimes they would live together. When they lived together, the living conditions were cramped. Their household included C.C.'s three children, Zepeda's two children, and sometimes members of their extended family. Zepeda said he had never been sexually inappropriate with a child in his life. However, according to Zepeda, C.C. was a violent person, and she was verbally and physically abusive to S.D.

During closing arguments, the State urged the jury to not be distracted by the issues related to C.C. The State also urged the jury to focus on S.D. during its deliberations, considering her demeanor during her testimony. According to the State, S.D. had no motivation to lie about the allegations against Zepeda. On the other hand, the defense pointed to purported inconsistencies in S.D.'s testimony, and asserted that the reason S.D. had lied about the allegations against Zepeda was to avoid getting in trouble with her mother. The defense maintained that C.C. had given her children a "topsy-turvy" life and had "exceedingly bad character." Thus, the defense argued that S.D. "chose to tell this lie" because she had been "raised by a woman . . . who knew she could get what she wanted by lying and that is what [S.D.] did."

---

[2]Parts of Valero's testimony were disputed by C.C. In particular, C.C. testified that she may have told a former landlord that her husband had pushed her, but she never told the same landlord that her husband was molesting and abusing her children.

The jury found Zepeda guilty on each charge in the indictment.

## DISCUSSION

Proper jury argument generally falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). However, comments that appear to cast aspersions on the character of defense counsel, and as a result, "strike over counsel's shoulder at the defendant," are not within the zone of proper jury argument. *Hinojosa v. State*, 433 S.W.3d 742, 760 (Tex. App.—San Antonio 2014, pet. ref'd). The Texas Court of Criminal Appeals has "consistently held that argument that strikes at a defendant over the shoulders of defense counsel is improper." *Davis v. State*, 329 S.W.3d 798, 821 (Tex. Crim. App. 2010). "In its most egregious form, this kind of argument may involve accusations of manufactured evidence, or an attempt to contrast the ethical obligations of prosecutors and defense attorneys." *Mosley v. State*, 983 S.W.2d at 249, 258 (Tex. Crim. App. 1998) (internal citations omitted). Milder comments, such as those merely indicating that the defense attorney's argument was an attempt to divert the jury's attention or obscure the issues, may not be erroneous so long as they can be interpreted as an attack on arguments made by the defense counsel. *Id.* at 258-59. "Although it is impossible to articulate a precise rule regarding these kinds of argument[s], it is fair to say that a prosecutor runs a risk of improperly striking at a defendant over the shoulders of counsel when the argument is made in terms of defense counsel personally and when the argument explicitly impugns defense counsel's character." *Id.* at 259.

Here, during the State's rebuttal closing argument, the prosecutor argued,

C.C. was abusive to everyone. C.C. was seeing other people. Right? Remember there was a bunch of that, "Oh, she was actually married when you started dating?" *You know, I find it deplorable and offensive that these two lawyers would come in here and make those type of accusations—*

(emphasis added). At this juncture, defense counsel objected by stating, "Objection to that sidebar, strike over our shoulders. It is inappropriate." The trial court overruled the objection.

Zepeda argues that the above-referenced argument was outside the scope of proper jury argument and thus the trial court erred in overruling his objection. We will assume, without deciding, that the argument was improper. Improper jury arguments that strike over the shoulders of defense counsel are nonconstitutional errors; thus, they fall within the purview of Rule 44.2(b). *Martinez v. State*, 17 S.W.3d 677, 692 (Tex. Crim. App. 2000); *Mosley*, 983 S.W.2d at 259. Under Rule 44.2(b), a nonconstitutional error that does not affect a defendant's substantial rights must be disregarded. TEX. R. APP. P. 44.2(b). In determining whether this type of error affected a defendant's substantial rights, we consider (1) the severity of the misconduct, that is, the prejudicial effect of the prosecutor's remarks, (2) any curative measures, and (3) the certainty of conviction absent the misconduct. *Mosley*, 983 S.W.2d at 259.

Zepeda argues the improper argument affected his substantial rights because it caused the jury to focus on defense counsel's alleged lack of personal integrity, instead of the logic of the argument that S.D. made up the sexual abuse allegations to get out of trouble with her mother. In analyzing whether the error affected Zepeda's substantial rights, we apply the harm analysis set out in *Mosley. See id.*

We begin by considering the first *Mosley* factor, the severity of the misconduct or the prejudicial effect of the prosecutor's argument. The argument in this case did not accuse defense counsel of lying or manufacturing evidence, which are the most egregious forms of impugning defense counsel's character. Nor did it inject new facts into the record. Instead, the argument suggested that Zepeda's lawyers engaged in improper conduct during their witness examinations. The argument was isolated; no other criticisms of defense counsel's conduct were made. And,

although the argument was made during the State's rebuttal, it was not made immediately before the jury went to deliberate.

In evaluating the severity of the misconduct, we may also assess whether the jury argument is extreme or manifestly improper by looking at the entire record of final arguments to determine if there was a willful or calculated effort on the part of the State to deprive the defendant of a fair trial. *See Brown*, 270 S.W.3d at 573. Here, considering the State's closing as a whole, we cannot conclude that there was a willful and calculated effort to deprive Zepeda of a fair and impartial trial. *See id*. And, considering the record as a whole, we cannot conclude that Zepeda was prejudiced by the argument in question. *See id*.

Because the trial court overruled the defense counsel's objection to the comment, no curative action was taken. Thus, the second *Mosley* factor is not relevant here.

We finally consider the third *Mosley* factor, the certainty of conviction absent the misconduct. The evidence in this case was strong. The State presented direct evidence of the charged offenses through S.D.'s testimony. The jury was able to observe S.D.'s demeanor as she testified. Furthermore, S.D. withstood two cross-examinations by the defense.[3] Zepeda also testified on his own behalf. However, in the end, the jury chose to believe S.D.'s version of events.

Because the misconduct, if any, was not severe and the State's case was strong, we conclude that any error was harmless.

## CONCLUSION

The judgments of the trial court are affirmed.

Karen Angelini, Justice

Do not publish

---

[3]The defense recalled S.D. during its case.