COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-337-CR

 

 

THOMAS GREGORY MARSHALL                                            APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM
THE 415TH DISTRICT COURT OF PARKER COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I. 
Introduction

In two
points, appellant Thomas Gregory Marshall appeals the sentence imposed by the
jury after he pleaded guilty to, and was convicted of, felony DWI.  We affirm.

 








                             II.  Factual and Procedural History

On May
17, 2007, at approximately 1:30 p.m., Captain William Ray of the Willow Park
Police Department received a dispatch about a possibly intoxicated driver.  Upon reaching the designated intersection, he
saw a gray car traveling on the wrong side of the road after it apparently ran
a pick-up truck off the highway.[2]  After he activated his lights and siren in an
attempt to stop the vehicle, it continued to drive for approximately one mile,
crossing over the road=s center line at least twice and
traveling between forty-five and fifty miles per hour in a thirty-five
mile-per-hour zone.  Marshall was the
vehicle=s driver
and sole occupant.








Captain
Ray administered a Horizontal Gaze Nystagmus test, which Marshall failed.  Captain Ray arrested Marshall for the
investigation of DWI and transported him to the Parker County Jail to
administer the intoxilyzer and other sobriety tests on videotape.[3]  Marshall failed three additional sobriety
tests.  He refused to provide a breath
sample for the intoxilyzer.  Captain Ray
obtained a search warrant for a sample of Marshall=s
blood.  The blood test revealed that
Marshall had a blood alcohol concentration of .33.[4]

Marshall
pleaded guilty to felony DWI, admitted to three prior misdemeanor DWI
convictions, and asked the jury to assess his punishment. Marshall testified at
trial and called eight character witnesses in support of his request for
community supervision.  At the close of
evidence, the jury assessed punishment at five years=
confinement and a $10,000 fine.  The
trial court denied Marshall=s motion
for new trial, and this appeal followed.

III. 
Motion for New Trial








In his
first point, Marshall complains that the trial court abused its discretion by
denying Marshall=s motion for new trial Abecause
substantial evidence that could have benefitted [Marshall] at sentencing was
not presented to the jury.@

A.  Standard of Review

We
review a trial court=s denial of a motion for new
trial under the abuse of discretion standard. 
State v. Herndon, 215 S.W.3d 901, 906B07 (Tex.
Crim. App. 2007).  We do not substitute
our judgment for that of the trial court; rather, we decide whether the trial
court=s
decision was arbitrary or unreasonable.  See
id. at 907B08.

Marshall
based his motion for new trial Ain the
interest of justice.@ 
The court of criminal appeals has spoken at length regarding the
granting of a new trial Ain the interest of justice@: 

Historically, we have consistently held that a
trial judge has the authority to grant a new trial Ain the interest of
justice@ and that his decision to
grant or deny a defendant=s motion for new trial is
reviewed only for an abuse of discretion. 
That discretion is not, however, unbounded or unfettered.  A trial judge has discretion to grant or deny
a motion for new trial Ain the interest of
justice,@ but Ajustice@ means in accordance with
the law. 

 








A trial judge does not have authority to grant a
new trial unless the first proceeding was not in accordance with the law.  He cannot grant a new trial on mere sympathy,
an inarticulate hunch, or simply because he personally believes that the
defendant is innocent or Areceived a raw deal.@  The legal grounds for which a trial court
must grant a new trial are listed in Rule 21.3, but that list is illustrative,
not exclusive.  A trial court may
grant a motion for new trial on other legal grounds as well. . . .  Although not all of the grounds for which a
trial court may grant a motion for new trial need be listed in statute or rule,
the trial court does not have discretion to grant a new trial unless the defendant
shows that he is entitled to one under the law. 
To grant a new trial for a non‑legal or legally invalid reason is
an abuse of discretion. . . . 

 

While a trial court has wide discretion in ruling
on a motion for new trial which sets out a valid legal claim, it should
exercise that discretion by balancing a defendant=s Ainterest of justice@ claim against both the
interests of the public in finality and the harmless‑error standards set
out in Rule 44.2.  Trial courts should
not grant a new trial if the defendant=s substantial rights were not affected.  Otherwise, the phrase Ainterest of justice@ would have no
substantive legal content, but constitute a mere platitude covering a multitude
of unreviewable rulings. . . . 

 

We need not today set out bright‑line rules
concerning appellate review of a trial court=s discretion in this area, but we do conclude
that a trial court would not generally abuse its discretion in granting a
motion for new trial if the defendant: 
(1) articulated a valid legal claim in his motion for new trial; (2)
produced evidence or pointed to evidence in the trial record that substantiated
his legal claim; and (3) showed prejudice to his substantial rights under the
standards in Rule 44.2 of the Texas Rules of Appellate Procedure. The defendant
need not establish reversible error as a matter of law before the trial court
may exercise its discretion in granting a motion for new trial.  On the other hand, trial courts do not have
the discretion to grant a new trial unless the defendant demonstrates that his
first trial was seriously flawed and that the flaws adversely affected his
substantial rights to a fair trial. 

 

Id. at 906B09
(internal citations omitted).

B.  Evidence








Marshall
complains that at the hearing conducted on his motion for new trial, he
produced evidence that was not presented to the jury during his trial through
no fault of his.  Specifically, he argues
that he, his wife, Greg Kemp, James Runyon, Lavell Ellis, Rocky Rogers, Charles
Fisher, Tom Campbell, and Edward Deary either were not available to testify at
trial because of short notice from his trial counsel or were not adequately
prepared and questioned during trial by his trial counsel.

  Marshall, his wife, Rogers, Fisher, Campbell,
and Deary testified at trial, as did Larry Adams (one of Marshall=s
friends), Ed Judge (Marshall=s
probation officer), and Steve Markwardt (Marshall=s AA
sponsor).  The trial testimony centered on
MarshallChis education
(associate degree in mechanical engineering, bachelor of business
administration degree, master of science degree in engineering, and a master of
business administration degree), his personality traits (his honesty and
integrity, his self-reliance, his excellent leadership and management skills,
and his reputation as a hard worker), his family (wife, two daughtersCone in high school
and one in collegeCan elderly aunt, his recently deceased
father), and his work history with Bell Helicopter and as a consultant.  It also centered on what his family and
friends were willing to do to help him comply with the terms and conditions of
community supervision.[5]









Marshall=s wife D.D.
testified that she had been married to Marshall for almost twenty-three years,
that they enrolled him in Baylor All Saints Hospital=s in-depth
treatment program after his arrest, and that Marshall has been in compliance
with all his bond requirements (i.e., treatment programs, his ankle bracelet,
weekly probation meetings, etc.).  About
Marshall, she testified that A[h]e=s a good all-around
guy period . . . ; he=s the type of guy that would give you the
shirt off his back.@ 
With regard to the changes she had noticed in Marshall, she testified:

It=s . . . the AA
program has been the major turnaround. 
But, again, I do want to emphasize that it=s not AA on the
surface.  It=s AA
penetrated.  And we stumbled a little bit
trying to get there because we thought we were doing the right things, but . .
. you have to really get involved.  It=s like attending
church andCand never volunteering or something.  We had to really get involved, come to a new
level, a different understanding.  It
wasn=t just about, oh,
he=s going to show up
and he=s going to get
better one day or it=sCthings are going
to beCour life is going
to be different.  When we found the right
sponsor, which was the key thing as well, things really started to turn around
because our activities in the church had a new connection to the sponsor. 

She testified that she would help Marshall
comply with the terms and conditions of community supervision if he were to
receive it.








Marshall
testified that he was fifty years old and that his father had also been an
alcoholic.  He testified that he had
completed an inpatient detoxification program as well as intensive outpatient
services and had secured a prescription for Antabuse from his family
physician.  Marshall credited
his wife with helping him to ask for help this time, and he testified about the
various programs he was enrolled in, including Alcoholics Anonymous.  He also gave the following
direct testimony:

Q.     Why haven=t you solved this
[alcoholism] problem before today?

 

A.     I think this is the
mind-set that I=ve had for my whole life.
And I=ve always thought that I
could control things, that I had to control things, and I didn=t feel like I should seek
help. . . .  [I]t was pride. 

 

. . . .

 

Q.     [W]hy is this time any
different than the others?  I mean, it=s easy to say that you=ve gone through, you
know, hundreds and maybe thousands of hours of programs.  Why should this jury extend you an
opportunity to continue these things as opposed to sending you to the
penitentiary?

 

A.     . . .  Once I was, I
guess, finally able to believe that this is truly something that I don=t have
control over, which ICwhich I need to be in controlCit=s
something that exceeds my . . . finite limitations. . . .  Once I learned that and humbled myself andCand what
D.D. said was right.  In previous times
going to AA and stuff, it was just an exercise. 
It=s just like, you know, yeah, I
got to be here.  And after a while the
stories are the same; it=s just maybe different
people.  And, well, that=s not me
because I still get up and go to work andCand I
still bring home this andCand it=s just
false hope.  But like, again, she stated,
if you get into the thing, it works.  ICI kind
of thought it would never work on me. 
Again, ICthis is about me.  But I=ve had
to really humble myself.  Started in the
treatment, started with my wife, and it=sCit=s just
crazy. . . . I can=t
believe I have put my family in this position, and my friends.








On
cross-examination, he added:

Like I said before, . . . I didn=t get it
in the past.  I=ve
totally been humbled by this. . . .  I=ve
admitted I do need help finally.  Tried
to get some spiritual stuff back in my life and back in my family.  My wife and kids . . . they=re still
here for me.  ICI love
them to death. I=m sorry to put everybody through
this.  ICbut I
think in the end it will be the best thing that ever happened to me and my
family. I owe them a lot.  I owe my
friends.  And I=ve let
them down.  And I look forward to the
future.  I=mCI=m an
honest person.  I feel like that.  And they have a reason to question myCthe trust
that we=ve built
over the years, andCand I want to build that
back.  We=re doing
that now.  D.D. and I are happier, you
know, within reason, as much as we have been in I don=t know
how long.  MyCmy girls
are coming around.  And, yeah, there=s a dad
now thatCyou
know, they=re 18 and 15, you know . . .
.  I owe it to them.  ICand I=m
looking forward to paying them back.


















The testimony at
the hearing on the motion for new trial and in the affidavits filed during that
hearing added no new information. 
Marshall testified that his participation in the various programs A[was]
totally different this time,@ that he
was sorry he had let so many people down, and that he regretted not getting to
tell the jury the differences between the relationship with his wife as
compared to the previous DWIs.[6]  His wife testified that his commitment to
treatment now was very different from his earlier DWI cases, that he had
overcomplied with his bond requirements, and that he would lose his family if
he started drinking and driving again.[7]  Lavell Ellis, a licensed chemical dependency
counselor, testified that Marshall had voluntarily participated in one of his
group classes for almost a year and was Aa pretty
committed man, I think.@ 
Ellis testified that, of his fifty-five clients, he considered Marshall
to be the lowest risk of reoffending because he seemed to be the most
committed, but he also testified that by Alow
risk,@ he was
talking about Aprobably less than five-percent
chance of relapse,@ and that he did not know what
Marshall=s blood
alcohol content was when he was arrested. 
And Gregory Kemp, who had known Marshall for thirty-four years,
testified that Marshall was a good family man and a good husband, that he was
Kemp=s
children=s
godfather, and that he had a new commitment to the programs that he had not had
in the past.    Marshall offered into
evidence affidavits from four character witnesses who testified at trial.  Deary=s
affidavit stated that the jury should have heard more about Marshall as a
person rather than about his professional background and economic status, that
Marshall was truly taking responsibility for his problem with alcohol, and that
Marshall was now devoting his time to people that support him and will help
keep him out of trouble.  Rogers=s
affidavit stated that Marshall has a great relationship with his daughters and
that A[t]his
situation@ had brought Marshall and D.D.
closer together; it also stated that the jury should have heard more about
Marshall personally, rather than about his education and profession, including
how Marshall handled his father=s
illness and changing needs prior to arrest, his aunt=s death
and estate, and relocation of another elderly aunt.  Fisher=s
affidavit stated that he felt he did not get the chance to emphasize for the
jury that Marshall was willing to do anything he needed to recover from his
alcohol problem, that Marshall was remorseful, and that Marshall has been doing
community service, including rebuilding houses in Galveston.  Campbell=s
affidavit stated that Marshall had Atruly
found >religion= in
dealing with his drinking problem,@ has a
closer relationship with his family since his arrest, and has made a Atruly
profound@ change,
and that jail time was not necessary and would not help Marshall recover. 








Marshall
offered into evidence affidavits from three additional character witnesses,
Greg Kemp, James Runyon, and Lavell Ellis. 
Kemp=s affidavit stated that Marshall
did not belong in prison and that Marshall was remorseful and Adefinitely
realizes what a bad and stupid thing it is to drive while intoxicated.@ Runyon=s
affidavit stated that Marshall recognized that the arrest was his fault and
that he takes it very seriously, that Marshall handled stress from family and
work responsibilities the wrong way by drinking, and that Marshall had much to
offer the community.  Ellis=s
affidavit stated that Marshall was in one of his treatment groups, was very
serious about getting treatment for his alcohol abuse problem, did not belong
in prison, and presented a low risk of reoffending if he continued his
involvement with AA and continued to follow a treatment program.  All of this evidence essentially duplicates
testimony admitted at trial by Judge, Deary, Adams, Markwardt, D.D., and
Marshall himself.

At the
conclusion of the testimony at the hearing, the trial court observed:

Well, candidlyCand correct me on this if
I=m mistaken, but, really,
the only variantCthe only objectively
assessed variance that we have with the evidence at trial is simply that Mr.
Ellis testified here today and did not at trial, and otherwise, the subject
matter covered . . . seems to be consistent. . . .  It=s just that his personal presence wasn=t here . . . but other
than that . . . the area was covered. 

 

The trial court denied the
motion.

C.  Analysis                                                       

After
reviewing the record before us, we hold that the trial court did not abuse its
discretion by denying a motion for new trial. 
The vast majority of the alleged Ashould-have-been-offered@
testimony presented at the hearing duplicated trial testimony, and we cannot say
that the testimony that purportedly would have been offered demonstrates that a
seriously flawed trial occurred or that Marshall=s
substantial rights were affected.  See
Herndon, 215 S.W.3d at 906, 909.  We
overrule Marshall=s first point.








IV.  Jury
Argument

In his
second point, Marshall complains that the trial court erred by not sustaining
his objection during closing arguments. 

A.  Closing Arguments

The
following dialogue occurred during the State=s
rebuttal:

[State]: What [defense counsel] is asking you to doCthe real base question
that you have to ask yourself is, [AD]o I trust Thomas Gregory Marshall?  Do I trust that if I don=t take the opportunity
and put him where he can=t drink and drive, that
he will not engage in that activity?[A]  And I
think you=ve got to reach inside of
yourself and look and say, [AY]ou know what, what=s his track record?[A]  Folks, I would submit to you his track record
is DWI, probation, goes to programs, gets some help; DWI, probation[,] goes to
programs, gets some help; DWI.  And,
folks, kind of one of the scariest parts to me, too, is that while he=s not the alcoholic in
the sense that we see that word or you go to the movies and see somebody
drinking constantly and falling over, he goes out socially, a couple times a
week and has some drinks.  In Bedford 30
miles away.  And you heard some of the
witness= testimony he drives
himself home.  That ought to scare
you.  That ought to scare you that this
defendant gets up and says, [AY]ou know what, oh, I may still have a few
[e]ffects ofCfrom the night before
because I drank some then, too, but went ahead and drove to work and, no, I=ve got no recollection of
running anybody off the road.[A]  But
we know the facts of this case are he was driving so badly, that someone called
inCa complainant called in
to the Willow Park Police Department dispatch and made that complaint.

 

[Defense counsel]: Your Honor, I think the Counsel is outside the
record, your Honor.  The Court will
recallC

 

[State]: Judge, that=s directly based on testimony.  They can recall it as they will.

 








[Defense counsel]: I=ll objectC

 

[Trial Court]: Overruled.  [Emphasis added.]

B.  Standard of Review

To be
permissible, the State=s jury argument must fall within
one of the following four general areas: 
(1) summation of the evidence; (2) reasonable deduction from the evidence;
(3) answer to argument of opposing counsel; or (4) plea for law enforcement.  Felder v. State, 848 S.W.2d 85, 94B95 (Tex.
Crim. App. 1992), cert. denied, 510 U.S. 829 (1993); Alejandro v.
State, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973).  If a jury argument exceeds the bounds of
proper argument, the trial court=s
erroneous overruling of a defendant=s
objection is not reversible error unless it affected the appellant=s
substantial rights.  Tex. R. App. P. 44.2(b); Martinez v. State, 17
S.W.3d 677, 692B93 (Tex. Crim. App. 2000); Mosley
v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh=g), cert.
denied, 526 U.S. 1070 (1999).  In
determining whether the appellant=s
substantial rights were affected, we consider (1) the severity of the
misconduct (i.e., the prejudicial effect of the prosecutor=s
remarks), (2) curative measures, and (3) the certainty of the punishment
assessed absent the misconduct.  Martinez,
17 S.W.3d at 692B93; Mosley, 983 S.W.2d at
259.

 








C.  Analysis

Marshall
argues that the State injected harmful facts into the case without support in
the record, stating, 

Simply put, nothing in the
testimony from the trial indicated that the complainant witnessed any Abad
driving@ on
behalf of Appellant.  Instead, the only
testimony on the issue indicated that the call was for a Apossible
intoxicated driver@ which does not speak to what
factor(s) were witnessed that led the caller to believe there was a possibility
that the driver was intoxicated. 

Captain
Ray gave the following testimony during the State=s direct
examination:

Q.     Okay.  At approximately 1:30 on that Thursday, May
17th, did you receive a dispatch?

 

A.     Yes, sir.

 

Q.     And where was that
dispatch received from?

 

A.     The Willow Park dispatch.

 

Q.     What was the nature of
that dispatch?

 

A.     They had received a call
of a possible intoxicated driver on Ranch House Road northbound.

 

Q.     Did you have any
d[e]scription of what kind of car it was?

 

A.     Yes, sir.  They advised it
was a grayCa gray vehicle.  They didn=tCI don=t
believe the complainant advised what type of vehicle.  It was a grayCgray
car.








Notwithstanding
Captain Ray=s direct testimony, Marshall
gave the following testimony on cross-examination:

Q.     Did you give any thought
to the fact that you were intoxicated before you got in that car to drive that,
what is it, 30 miles from Bedford to Willow Park?

 

A.     I honestly can=t say.  ICI=mCI=mCI knew I didn=t need to drink anymore and I needed to go about
my plan for the day.

 

Q.     Does it concern you
that you were driving so badly, that someone called in on a cell phone to a
police department and said, hey, you need to look out for this gray Volvo?

 

A.     . . . [W]hat was described
earlier, I think it was overstated. ICitCit concerns me, yes, but
I don=t recall running anybody
off the road at all.

 

[Defense]:  Your Honor, we
object.  There=s no testimony from any
officer of that occurring.

 

[Trial court]: Sorry?

 

[Defense]:  We=re going to object to
that.  There=s no testimony from any
ofCthe witness stand of any
of the things he said occurring.  If he
wants to put a witness upC

 

[Trial court]: Overruled.  [Emphasis added.] 

Marshall does not complain on
appeal about this objection being overruled.  









Assuming,
without deciding, that the trial court erred by not sustaining Marshall=s
objection to the State=s controversial statement in
closing arguments, we first consider the prejudice, if any, caused by the
improper remark.  See Hawkins v. State,
135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (APrejudice
is clearly the touchstone of the first factor in the Mosley test.@). The
statement was made a single time, without elaboration, emphasis, or subsequent
direct or indirect reference, and the subject matter of the statement itself
was not inflammatory or egregious.  This
factor weighs in favor of the State. 
However, no curative measures were taken because Marshall=s
objection was overruled, and this factor weighs in Marshall=s
favor.  Finally, however, it is with
regard to the certainty of the punishment assessed absent the misconduct that
we conclude that the error did not affect Marshall=s
substantial rights.  See Tex. R.
App. P. 44.2(b). 

First,
the jurors could have reasonably deduced for themselves that Marshall was
driving Abadly,@ given
that his blood alcohol content was more than four times the legal limit; given
Captain Ray=s testimony about Marshall=s
driving and his performance on the sobriety tests, and the publication of the
sobriety test videotape; and given Marshall=s
testimony that he did not recall running anybody off the road (contrary to
Captain Ray=s testimony).








Second,
Marshall admitted to three prior convictions for DWICin 1991,
1994, and 1999Ctwo of which also involved
charges for possession of marijuana, although at least one of the possession
charges was dropped in exchange for a guilty plea to the DWI charge.[8]  Deary, one of Marshall=s
character witnesses, admitted on cross-examination that it was worse that
someone could be caught three times for DWI and continue to do it.  Rogers, another of his character witnesses,
stated on cross-examination that he thought Marshall recognized back during the
prior DWIs that he had an alcohol problem.

Finally,
the punishment assessedCfive years=
confinement and a $10,000 fineCwas in
the mid-range of punishment allowed for an individual with three prior DWI
convictions.  See Tex. Penal Code
Ann. ' 12.34
(Vernon Supp. 2009) (stating that the punishment range for a third degree
felony is two to ten years and up to a $10,000 fine), ' 49.09(b)(2)
(Vernon Supp. 2009) (stating that DWI is a third degree felony if the person
has previously been convicted two times of DWI).  This factor weighs in favor of the
State.  In light of the foregoing, we
hold that the error, if any, in overruling Marshall=s
objection to the State=s comment during closing
argument was harmless.  We overrule
Marshall=s second
point.

 

 

 








V. 
Conclusion

Having
overruled Marshall=s two points, we affirm the
trial court=s judgment.

 

 

BOB MCCOY

JUSTICE

 

PANEL: DAUPHINOT, MCCOY, and MEIER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED: January 28, 2010

 











[1]See Tex. R. App. P. 47.4.





[2]Captain Ray testified as
follows:

 

Q.     What happened after you turned north on Ranch House [Road]?

 

A.     . . .  When we entered the
left-hand corner, I observed a pickup truck coming south on Ranch House [Road]
coming back onto the roadway.  GrassCyou could see the grass
and the dust coming up from the shoulder. 
I also observed a gray vehicle in front of another car that was coming
back over onto the right-hand side of the roadway.

 

Q.     That had been traveling on the incorrect side of the road?

 

A.     Yes, sir.





[3]The videotape of the
sobriety tests was admitted into evidence and published to the jury.





[4]A person is legally
intoxicated if his blood alcohol concentration is 0.08 or more.  Tex. Penal Code Ann. ' 49.01(2)(B) (Vernon
2003).





[5]Marshall=s character witnesses,
most of whom had known him for many years, testified that they would assist him
in following the terms and conditions of community supervision.





[6]During the motion
hearing, he testified as follows:

 

Q.     Now, did you get a chance toCto tell the jury at your trial theCthe differences in the
relationship withCbetween you and your wife
now as compared to your prior DWIs?

 

A.     No.

 

Q.     And is that an important component, in your opinion, inCin making sure that you=re not going to be out
drinking and driving?

 

A.     ItCit is.  It is major. 
It is a major component.

 

Q.     And are you committed to continuing with treatment and AA in the
future?

 

A.     I=m very committed.  And, as funny as this may sound, ICI look forward to the
future for that because I=ve got a little taste of
helping some people, and I sure have the history to know what not to do . . . .


 

He also added that, in his previous experience with AA, he did not
really have a sponsor and went through the required steps rather quickly
without Aexercising the intent of
the program.@  This time, he had been in AA for
approximately sixteen months and was on the twelfth step of the program.  This time, he had Markwardt, Ellis, Judge,
and his wife as a support group.  This
testimony generally duplicated trial testimony by Fisher, Judge, Deary, Adams,
Markwardt, D.D., and Marshall himself.





[7]D.D. additionally
testified that she had noticed a significant difference in Marshall following
his arrest in this case as compared to his behavior and attitude following
probation for his prior DWI offenses in that what he does on his own now is
voluntary.  She testified that while he
previously attended the DWI Education Class and some AA classes, he never made
the right connection after the third DWI, and she was not able to truly help
him with recovery because she mistakenly believed that he could simply will
himself to stop drinking and did not understand that alcoholism is a disease.  This time, she was able to effectively help
Marshall maintain his sobriety, and their relationship had become stronger and
healthier as a result of Marshall=s commitment to sobriety.  Overall, Marshall=s commitment to treatment
is now very different from his prior DWI cases, and he now has a safety net in
place that was not available following his prior DWI arrests.  This testimony generally duplicated trial
testimony by Fisher, Judge, Deary, Adams, Markwardt, Marshall, and D.D.
herself.





[8]In both instances,
Marshall testified that the marijuana belonged to someone else.  He stated that he, Afortunately, never had a
drug problem.@