# NO. 12-10-00027-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *JASON THAD PAYNE,* *APPELLANT* | § | *APPEAL FROM THE 402ND* |
| *V.* | § | *JUDICIAL DISTRICT COURT OF* |
| *THE STATE OF TEXAS,* *APPELLEE* | § | *WOOD COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Jason Thad Payne appeals his conviction for murder. In five issues, Appellant argues that the evidence is insufficient to support the verdict, that the trial court erred in allowing certain testimony, and that State was obligated to correct erroneous testimony. We affirm.

## BACKGROUND

On December 11, 2007, Appellant called 911 from his house and told the operator that "his wife and his son are both shot" and that he needed help. Officers responded and found Appellant's wife, Nichole, dead in her bedroom. She had been shot in the head, and her body was still warm when the police arrived. The police found Austin Taylor Wages, Nichole's teenaged son,[1] lying on his bed with a fatal gunshot wound to his head. His body was found in what was described as a sort of a garage apartment that was his bedroom. His body was cold to the touch. He had a rifle between his legs, and it appeared that he might have shot himself.

Appellant told the police that he did not shoot Nichole or Austin. He told the investigators that he left the house that morning and dropped his five year old son off at school at

---

[1] The young man was called Taylor at home and Austin at school. For ease of reference, we will refer to him by the name Austin.

around 8 a.m. He told the investigators that he and his two year old daughter returned home, but turned around to go back to town to take her to the park. He said that they did not go to the park, but went back to the house to tell Nichole their plans. However, upon returning, instead of going into the house, he and his daughter went to throw acorns into a creek on the property. Appellant said that after stopping to check on some birds that were part of a family business, he went into the house and discovered Nichole and Austin. His call to 911 was made at 9:09 a.m.

Appellant told investigators that he and Nichole did not have marital problems and that the family did not have financial problems. Noel Martin, a crime scene investigator with the Smith County Sheriff's Office, conducted an investigation during which he reached the conclusion that Austin shot himself. The rifle found with Austin's body was used to shoot both him and Nichole. Subsequent investigation and laboratory work led the investigators to the conclusion that Austin could not have shot himself.

In December 2008, a Wood County grand jury indicted Appellant for the offense of capital murder, alleging that Appellant shot and killed Nichole and Austin. The State did not seek the death penalty, and Appellant pleaded not guilty. According to the evidence at trial, the investigators concluded that Austin could not have shot himself based on an assessment of the entire scene of the shootings, and the physical geometry of the gun and the distance between the end of the rifle and Austin's body at the time the rifle was fired.

A trial was held, and the jury found Appellant guilty as charged. He was sentenced to life imprisonment. This appeal followed.

## SUFFICIENCY OF THE EVIDENCE

In his first and second issues, Appellant argues that the evidence is legally and factually insufficient to support the jury's verdict.

### Standard of Review

Prior to 2010, Texas appellate courts reviewed both the legal and factual sufficiency of the evidence to support a verdict in a criminal case. Legal sufficiency review is defined by *Jackson v. Virginia*, 443 U.S. 307, 315-16, 99 S. Ct. 2781, 2786-87, 61 L. Ed. 2d 560 (1979). Factual sufficiency review is defined by *Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). In October 2010, the court of criminal appeals held that there is "no meaningful distinction between the *Jackson v. Virginia* legal sufficiency standard and the *Clewis* factual

sufficiency standard" and overruled *Clewis* and its progeny.  *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality opinion).  The court held that "the *Jackson v. Virginia* standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt."  *See id.*  Accordingly, we will consider Appellant's arguments that the evidence is legally and factually insufficient together under the *Jackson v. Virginia* standard of review.

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 315-16, 99 S. Ct. at 2786-87; *Brooks v. State*, 323 S.W.3d at 899.  Under this standard, a reviewing court does not sit as a thirteenth juror and may not substitute its judgment for that of the fact finder by reevaluating the weight and credibility of the evidence.  *See Brooks*, 323 S.W.3d at 899; *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).  Instead, a reviewing court defers to the fact finder's resolution of conflicting evidence unless that resolution is not rational in light of the burden of proof.  *See Brooks*, 323 S.W.3d at 899–900.  The duty of a reviewing court is to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime.  *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

The sufficiency of the evidence is measured against the offense as defined by a hypothetically correct jury charge.  *See Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).  Such a charge would include one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant is tried."  *Id.*

In this case, to support Appellant's conviction for capital murder, the State's evidence had to show that Appellant intentionally or knowingly caused the deaths of Nichole and Austin during the same criminal transaction.  *See* TEX. PENAL CODE ANN. § 19.03(7)(A) (Vernon Supp. 2010).

## Analysis

As in almost every criminal case, there is direct evidence that supports the verdict in this case and there is circumstantial evidence that supports the verdict.  The circumstantial evidence

in this case, as we will discuss, is not very helpful in resolving the case or in evaluating the jury's verdict.[2] And the conclusions to be drawn from the direct evidence are subject to considerable disagreement.

With two people shot to death in their beds, there was a great deal of physical evidence for investigators to gather and for experts to evaluate. Both sides called experts to explain to the jury the conclusions that could be drawn from the stippling–a pattern of dots or tattoos left on skin or other surfaces that are close to a discharging firearm–and soot found on Austin, from the patterns and pooling of blood from his wounds, and from the simple geometry of how his body was positioned both before and after he was shot. The trial became a contest between two narratives. In the State's version, Appellant shot Austin, either before he took his son to school or after he returned to the home, and then shot Nichole. He staged the scene in Austin's room to look like a suicide and then called the police. In Appellant's version of events, Austin shot his mother and then shot himself.

There were several problems with Appellant's version of events. First, Austin did not have any of his mother's blood on his person. The State's expert testified that he would expect to see some of Nichole's blood on Austin if he had shot her because the shooter would have been reasonably close to Nichole and some biological material would have, by a principle called "blow back," been placed on the shooter.[3] Additionally, the experts were in rough agreement that the rifle used to shoot Austin was at least six inches from his face when the shot was fired. Appellant's expert testified that the distance was between four and ten inches; the State's expert testified that it was within two inches of twelve inches. Because the rifle had a safety mechanism that would have had to have been employed to allow it to discharge, Austin would not have been able to shoot the rifle with his hand unless the distance between the end of the barrel and his face was about six inches or less. Appellant's expert testified that Austin could have shot the rifle with the end of the barrel ten inches from his face if he used his feet to prop it up against the floor and operated the safety and trigger with his toes.

Also, it was important to the State's expert that there was no "blow back" of Austin's

---

[2] No one saw this shooting, and all of the evidence is indirect to a lesser or greater degree. We refer to the physical evidence and the conclusions drawn by experts using scientific principles as direct evidence, and evidence based on conclusions drawn from social relationships or ideas about motive or opportunity as circumstantial evidence.

[3] There was no blow back material found on Appellant's person or his clothing, but there were some clothes in the dryer that investigators thought had been recently cleaned.

4

biological material on the floor in front of his body, something he would have expected if Austin had shot himself while in a seated position. In addition, the rifle was resting in Austin's lap, and the State's expert thought that it would have moved from that position away from the body if Austin had managed to shoot himself. Finally, there was blood on the palm of Austin's hand, which was facing upwards. The State's expert testified that based on where the blood flowed from Austin's wound, blood would not have reached the top of his hand. Therefore, he concluded that the body had been moved after the shooting.

As to the circumstantial evidence, investigators found what appeared to be a small amount of blood on Appellant's truck and found a wash cloth in his truck that had what was described as fresh blood on it. The blood on the wash cloth was Nichole's blood. The investigators also found what one witness termed as graves–two large holes in the ground–on the property. Finally, there was evidence of marital discord and that Appellant and his family faced financial distress. Also, Appellant had bought life insurance on his wife and stepson several months before the shooting

The bloody rag would appear to be a substantial piece of evidence, although, as Appellant points out, the photograph admitted into evidence depicting it does not show a bright red coloration, which is how it was described by witnesses. While obtaining the proceeds of the life insurance policy could have been a motive, the evidence does not support the conclusion that it was part of a longstanding plan to kill Nichole and Austin. The life insurance was purchased at a time of significant financial change in Appellant's and Nichole's life because he had just received proceeds of a lawsuit in an amount of more than $300,000. The rider for the child was for, essentially, burial expenses, and there was evidence that Appellant could have elected to purchase a policy with a higher benefit for little additional money.

As to financial stresses within the family, some of the State's evidence about financial stress included Nichole's depression as a result of financial troubles. However, her depression had been diagnosed at a time prior to the settlement of the lawsuit. The lawsuit was settled more than six months before the shooting. Furthermore, while the State was able to show that the family's bank account was overdrawn at the time of the shooting, Appellant had purchased several vehicles and a home for cash from the proceeds of the lawsuit. Also, the family had some income from a small business. In short, the evidence would support the conclusion that Appellant had spent the settlement and was out of money. However, it would also allow the

5

conclusion that the family's financial problem was one of cash flow, and that the things that are monthly obligations for so many families–a mortgage and a car payment–were not an issue for this family.

With respect to emotional stress within the family, several witnesses testified that there were problems between Nichole and Appellant. Nichole's ex-husband testified that she sent him postcards asking for money. Her father testified that Appellant did not want her to have contact with him. Nichole's sister-in-law testified that Nichole had wanted a divorce and that she had said that Appellant had threatened to kill her. In addition, the State asserts that it is significant that Appellant denied to the investigators that the family had marital or financial issues.

Finally, Appellant's timeline of events is not inconsistent with the verdict. According to what he told the police, he arrived home sometime around 8:15 a.m., but did not call the police until after 9 a.m. He had an explanation for this–he was throwing acorns in the yard with his toddler–but it is not an alibi that is supported by evidence other than his statement.

After careful review of the evidence, and in a light most favorable to the verdict, we conclude that what we have termed circumstantial evidence is not sufficient, standing alone, to support the verdict. The blood on the rag is not bright red, many married couples have life insurance, the evidence is inconclusive as to whether the family was in any financial distress, and Appellant's denial of marital issues is neither surprising nor as unequivocal as the State suggests it was. Likewise, the holes in the ground on the family property, while a mystery, do little to suggest that Appellant killed his wife and her son. Finally, one of Appellant's witnesses testified that Nichole did not arise until 10 or 11 a.m., and that Appellant often engaged in outdoor activities after dropping his son off at school.

The question then is whether the jury could have concluded that the forensic evidence showed that Austin did not shoot himself. After careful review of the evidence, we hold that a rational jury could have concluded that the evidence showed beyond a reasonable doubt that Austin did not shoot himself. There are three parts of the physical evidence that lead us to this conclusion. First, the theory posited by Appellant is implausible. Austin would have had to point the rifle at his face while maintaining a distance of at least four inches from the end of the barrel to his face. He would then have had to engage the safety and fire the rifle, all while looking down the barrel. The expert testimony was that most suicides involving gunshot wounds occur with the end of the barrel touching or very close to the body. Also, the expert testimony

6

was that it was very rare, if ever, that a person committed suicide while looking at the opening of the barrel of a firearm.

Just because Appellant's version of events is implausible does not mean the State's burden of proof is satisfied. However, the combination of the State's expert's forensic conclusions about the positioning of Austin's body is compelling. There was pooled blood on the uppermost portion of his hand, where it would not have had occasion to collect if Austin's body had not been moved. Additionally, the lack of biological material on the floor allows the conclusion that he was not shot while in a sitting position, which was necessary to Appellant's construction of the shooting. Third, the jury could have credited the conclusions of the State's expert witness that the barrel was at least ten inches from Austin's head when the shot was fired. This would have allowed the conclusion that it was essentially impossible for Austin to have shot himself.

Taking this forensic evidence together, and viewing it in a light favorable to the verdict, we hold that a rational jury could have concluded that Austin did not take his own life. That determination flows fairly directly to the conclusion that Appellant is the person who shot Nichole and Austin. There were other possibilities: Austin could have shot Nichole and Appellant shot Austin, or an unknown third party could have shot Austin or Nichole. But once the jury concluded that Austin did not shoot himself, the conclusion that Appellant shot them both is reasonable.

There is significant evidence contrary to the verdict. Appellant did not have any biological material on his person or clothing, and he did not have gunshot residue on his hands. He did not flee, and he did not confess. Nevertheless, the jury's conclusion that Austin did not shoot himself is supported by the evidence, and we hold that a rational jury could have concluded beyond a reasonable doubt that Appellant shot Nichole and Austin and that he was guilty of capital murder. We overrule Appellant's first and second issues.

<u>**ADMISSION OF EVIDENCE**</u>

In his third issue and fourth issues, Appellant argues that the trial court erred in allowing the State to offer into evidence certain statements made by Nichole Payne.

**<u>Background</u>**

Appellant's arguments center on statements made by Nichole to two witnesses that were

7

admitted at trial. Specifically, Richard Hawthorne, Nichole's father, testified that Nichole had told him that Appellant did not want her to have any contact with her parents. Sarah Hawthorne, Nichole's sister-in-law, testified that Nichole told her the night before her death that she wanted a divorce and that Appellant had threatened to kill her. She also said that Nichole had made similar statements several months earlier. Finally, she testified that Nichole told her that Appellant had threatened to burn her alive in the house and had begged her to "avenge" her if anything happened to her. Appellant objected to all of the statements on the grounds that they were inadmissible hearsay.[4]

**Standard of Review and Applicable Law**

Generally, we review a trial court's ruling to admit or exclude evidence under an abuse of discretion standard. *See Robbins v. State*, 88 S.W.3d 256, 260 (Tex. Crim. App. 2002) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990)). A trial court abuses its discretion if its decision falls outside of the "zone of reasonable disagreement." *Montgomery*, 810 S.W.2d at 391. In conducting this review, we defer to the trial judge's assessment of the weight and credibility of the evidence and view the evidence in the light most favorable to the trial court's decision. *See Kelly v. State*, 824 S.W.2d 568, 574 (Tex. Crim. App. 1992).

"Hearsay" is an out of court statement "offered in evidence to prove the truth of the matter asserted." TEX. R. EVID. 801(d). Hearsay is inadmissible. TEX. R. EVID. 802. However, statements that are an expression of a then existing mental, emotional, or physical condition including an existing state of mind or emotion are an exception to the hearsay rule and are admissible. *See* TEX. R. EVID. 803(3). Additionally, although the statute must be read in harmony with other evidentiary provisions, Texas law allows the State to offer "testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.36 (Vernon 2003); *Garcia v. State*, 201 S.W.3d 695, 702 (Tex. Crim. App. 2006); *Smith v. State*, 5 S.W.3d 673, 678–79 (Tex. Crim. App. 1999) (evidence admissible under

---

[4] The State asserts that Appellant's complaints were not preserved for appellate review for lack of a specific objection. We disagree. In each instance, Appellant objected on the grounds that the out of court statements were inadmissible hearsay. The State offered a basis for admission of the evidence, and the trial court ruled on the objection. Appellant did not accept the State's rationale for admitting the evidence, and Appellant's objection was reasonably sufficient to alert the trial court to his complaint. *See* TEX. R. APP. P. 33.1(a)(1)(A). Accordingly, this complaint is preserved for our review.

Article 38.36(a) may still be excluded under the rule of evidence).

**Analysis**

Several of the statements offered by the State were clearly expressions of Nichole's beliefs at the time they were expressed. Her statement that her husband did not want her to have contact with her parents and that she wished to divorce Appellant were expressions of her state of mind at the time they were made and were admissible as an exception to the hearsay rule. *See Martinez v. State*, 17 S.W.3d 677, 689 (Tex. Crim. App. 2000). Appellant did not object on the basis that these statements were not relevant, and the trial court's decision to admit those statements is not an abuse of discretion.

Some of the statements went beyond simple expressions of Nichole's state of mind. For example, the statement that Appellant had threatened to kill her was not an expression of Nichole's state of mind. It explains the reasons for her state of mind, but Rule 803(3) permits only the expression of the state of mind and specifically does not include "a statement of memory or belief to prove the fact remembered or believed." *See* TEX. R. EVID. 803(3); *Dorsey v. State*, 24 S.W.3d 921, 929 (Tex. App.–Beaumont 2000, no pet.); *Barnum v. State*, 7 S.W.3d 782, 790 (Tex. App.–Amarillo 1999, pet. ref'd); Cathy Cochran, TEXAS RULES OF EVIDENCE HANDBOOK, 825–26 n.362 (5th ed. 2003). Also, her statement begging her sister-in-law to avenge her death was not a statement of her state of mind but a supposition that her husband would be responsible if she were to be killed. That kind of statement does not fit into the state of mind exception to the hearsay rule. *See Dorsey*, 24 S.W.3d at 929 (citing *Barnum*, 7 S.W.3d at 790 and *Vann v. State*, 853 S.W.3d 243, 250 (Tex. App.–Corpus Christi 1993, pet. ref'd)).

The State argues that Nichole's request that her sister-in-law avenge her death is admissible and cites *Martinez*, 17 S.W.3d at 688, in support of its argument. In *Martinez*, the court held that the victim's statement that she was afraid of the defendant was admissible as a present sense impression as was her plea to her landlord to call the sheriff if the defendant was spotted. *Id*. at 689. We have held that Nichole's statements that she was afraid of Appellant were admissible, which is consistent with the *Martinez* decision. The victim's statement in that case to call the police was not, as the court noted, an expression of a fact. *Id*. Instead, it was more appropriately considered to be an expression of her fear of the defendant. *Id*. By contrast, Nichole's prediction that her death would need to be avenged was a guess. If it expressed no more than her fear of Appellant, it would fall within *Martinez*. But it cannot be said that her

9

state of mind was that Appellant would be the person to kill her. That is a prediction or a conclusion drawn from her experiences, but it was not her state of mind.

For the same reasons, Article 38.36 does not allow this kind of evidence to be admitted. As we stated earlier, Article 38.36 is no broader than the rules of evidence. While the fact that Nichole was fearful of Appellant may be a "fact" of their relationship, the fact that she thought he would be her killer is not the same kind of evidence.

Error in the admission of evidence is nonconstitutional error. *See **Johnson v. State***, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). Nonconstitutional error that does not affect the substantial rights of the defendant must be disregarded. *See* TEX. R. APP. P. 44.2(b). Therefore, even if the trial court erred in overruling Appellant's hearsay objection, the error would not warrant reversal unless it had a substantial and injurious effect or influence in determining the jury's verdict. *See **King v. State***, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).

We conclude that any error in the admission of evidence in this case was harmless. For reasons we explained in the sufficiency of the evidence section of this opinion, it would not be reasonable or likely for a jury to convict Appellant solely on the circumstantial evidence consisting of the insurance policy, the holes dug on the property, and Appellant's animosity towards Nichole or her family. Indeed, if the jury concluded that it was possible that Austin could have shot himself–that is that the scene of his death was not staged–it would be very difficult for the jury to have reached its verdict in light of the State's burden of proof. This is not to say that the admission of harmful and incompetent evidence could not sway a jury to reach a conclusion that is unreliable. Indeed, in ***Dorsey*** the court of appeals remanded the case for a new trial because of the erroneous admission of hearsay statements including the victim's prediction that the defendant in that case would be the one who killed her if she died in an "unusual way." ***Dorsey***, 24 S.W.3d at 929–30; *see also **Erazo v. State***, 167 S.W.3d 889, 891 (Tex. App.– Houston [14th Dist.] 2005, no pet.) (reversing for new punishment hearing because of improperly admitted photograph of unborn child).

This case is different from ***Dorsey*** in that the State's proof in that case relied exclusively on circumstantial evidence and the verdict rested on inadmissible evidence. ***Dorsey***, 24 S.W.3d at 930. In this case, the only plausible conclusion about the evidence is that the jury concluded that Austin could not have shot himself based on the physical evidence. In that context, the verdict rests on very substantial grounds and the admission of Nichole's hearsay statements had

10

little or no effect on the verdict. We overrule Appellant's third issue.

CONFRONTATION CLAUSE

In his fourth issue, Appellant argues that the admission of Nichole's statement that he did not want Nichole to talk to her family violated his right to confront the witnesses against him.

**Applicable Law**

The Confrontation Clause of the Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. This procedural guarantee bars the admission of testimonial statements of a witness who does not appear at trial unless the witness is unavailable and the defendant had a prior opportunity to cross examine him. *See Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 1369, 158 L. Ed. 2d 177 (2004). The threshold question in determining whether the trial court erred in admitting the complained of evidence is whether the evidence is testimonial in nature. *See Woods v. State*, 152 S.W.3d 105, 113 (Tex. Crim. App. 2004). Generally speaking, a statement is testimonial if it is a solemn declaration made for the purpose of establishing some fact. *Crawford*, 541 U.S. at 51, 124 S. Ct. at 1364. In *Crawford*, the Supreme Court held that the Confrontation Clause is "most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding." *Id.*, 541 U.S. at 54, 124 S. Ct. at 1365.

**Analysis**

The trial court allowed the testimony over Appellant's Confrontation Clause objection on the basis that Appellant had caused Nichole to be unavailable to testify. This theory of admissibility is called forfeiture by wrongdoing, and it has a long history. *See Giles v. California*, 554 U.S. 353, 359, 128 S. Ct. 2678, 2683, 171 L. Ed. 2d 488 (2008) (tracing forfeiture by wrongdoing principle to *Lord Morley's Case*, 6 How. St. Tr. 769, 71 (H. L. 1666)).

The problem with applying forfeiture by wrongdoing in this case, however, is that, under the interpretation settled upon by the Supreme Court, the principle applies only when the witness cannot be confronted because the defendant engaged in conduct designed to prevent the witness from testifying. *Id.*, 554 U.S. at 359–61, 128 S. Ct. at 2683–84. Appellant did not kill Nichole to keep her from testifying in his murder trial or at any other hearing or trial. Accordingly, he did not forfeit his right to confront her as a witness.

11

However, as the State points out, we are to uphold the trial court's decision on an evidentiary ruling if it is correct under any theory, even if the trial court gave no reason or the wrong reason for its ruling. *See Bowley v. State*, 310 S.W.3d 431, 434 (Tex. Crim. App. 2010). Nichole's statement that it was Appellant's wish that she not be in contact with her family does not violate the Confrontation Clause because her statement is not testimonial. The Confrontation Clause allows a defendant to confront witnesses who "bear testimony" and that testimony cannot be admitted unless a defendant is permitted to confront the accuser. *See Crawford*, 541 U.S. at 51, 124 S. Ct. at 1364. Testimony is typically "a solemn declaration or affirmation for the purpose of establishing or proving some fact." *Id*. And the "principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused." *Id*., 541 U.S. at 50, 124 S. Ct. at 1354. In *Crawford*, the court left "for another day any effort to spell out a comprehensive definition of 'testimonial,' but noted 'at a minimum' it includes 'prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations.'" *Michigan v. Bryant*, __ U.S. __, 131 S. Ct. 1143, 1153, 179 L. Ed. 2d 93 (2011) (quoting *Crawford*, 541 U.S. at 68, 124 S. Ct. at 1374).

As the Court explains in *Bryant*, there has been significant refining of the definition of "testimonial" evidence since the *Crawford* decision. In the companion cases *Davis v. Washington* and *Hammon v. Indiana*, 547 U.S. 813, 826, 126 S. Ct. 2266, 2276, 165 L. Ed. 2d 224 (2006), the Court held that interrogations by law enforcement officers "fall squarely within [the] class of testimonial hearsay" when they are solely directed at establishing the facts of a past crime. In that case, the Court drew a distinction between statements to police in an emergency setting given while the events were still unfolding and a more formal investigative style interview. The first statement was not testimonial, in part because it was elicited to resolve the then present emergency, and the second statement was testimonial. *Id*. 537 U.S. at 829–30, 126 S. Ct. 2278–79.

This paradigm was further refined in *Bryant*, but we need not travel to the end of this road to determine that the statements admitted here were not testimonial. The statements were made by Nichole to her father. Some of the later statements, specifically the statement about avenging her death, presuppose a later court date or at least an investigation. But the statements about Appellant wishing to limiting Nichole's contact with her family were not given in anything

12

like a preliminary hearing and had nothing in common with a grand jury proceeding or a police interrogation. Indeed, the Supreme Court has noted that "[s]tatements to friends and neighbors about abuse and intimidation and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules." *Giles*, 554 U.S. at 376, 128 S. Ct. at 2692.[5] This is so because these statements were not made in anticipation of litigation, were not gathered to be used in court, and were not made to be used in court. *Cf. Davis*, 547 U.S. at 830, 126 S. Ct. at 2278 (deliberately recounted statements of past criminal events to police officer are an "obvious substitute for live testimony").

The Confrontation Clause was not implicated by the introduction of Nichole's statement to her father, and the trial court did not err in allowing its admission. We overrule Appellant's fourth issue.

## SPONSORING FALSE TESTIMONY

In his fifth issue, Appellant argues that the State violated his right to due process by sponsoring false testimony.

### Background

The testimony in question is that of Lieutenant Miles Tucker who was an investigator on this case. Tucker was asked on cross examination about a meeting attended by him, the district attorney or his representative, and Noel Martin, a Smith County sheriff's deputy. Martin is a crime scene investigator, and he had been called in to assist with the investigation.

Martin concluded preliminarily–some of the forensic work had not been completed–that Austin committed suicide. He presented that conclusion at the meeting with Tucker. Tucker testified that he was not satisfied with Martin's explanation. He told the jury that when he pressed Martin for detailed responses to his questions, Martin's only response was that he had seen these kinds of cases "many, many times." Martin testified differently. He testified that he was asked a number of questions at the meeting and that he believed that he had "answered all of the questions that were pertinent to this issue."

### Analysis

---

[5] Two of the Justices thought the statements at issue in *Giles*, which were statements given to a police officer, were not testimonial, but the majority concluded that argument had not been made in the lower courts. *See Giles*, 554 U.S. at 377, 378, 128 S. Ct. at 2693, 2694 (Thomas, J., concurring; Alito J., concurring).

13

Appellant asserts that the district attorney was present at the meeting and that the district attorney violated his right to due process by allowing the jury to hear Tucker's version of events and not correcting it.[6]  Implicit in this assertion is that Tucker's version of events is false.

The law is clear that the "deliberate deception of court and jury by the presentation of testimony known to be perjured" violates a defendant's right to due process.  *See Mooney v. Holohan*, 294 U.S. 103, 113, 55 S. Ct. 340, 342, 79 L. Ed. 791 (1935).  A deception occurs when perjury is sponsored but also when a witness's testimony "gives the trier of fact a false impression" on a sufficiently important issue.  *See Ex parte Ghahremani*, 332 S.W.3d 470, 477 (Tex. Crim. App. 2011).

The problem with the application of that standard to this case is that there is no showing that the testimony offered by Tucker was false or that he left the trier of fact with a false impression.  The State is correct to assert that Tucker's testimony about the meeting is slightly more detailed than Appellant's description in his brief.  On the other hand, Tucker did present the meeting as one where, in the end, Martin was unable to answer questions put to him by anything other than a resort to his statement that he had seen these kinds of cases "many, many times."  If that is not an accurate assessment of the meeting, there may be some question as to whether the district attorney had an obligation to correct the record.  However, as the record before us stands presently, we cannot conclude that Tucker's rendition of events was inaccurate.

In his reply brief Appellant states that "[o]ne thing is certain, the District Attorney knew at the time the testimony was given, and knows now, whether the testimony was truthful."  Because it does not appear that he was present at the meeting, it is not clear at all that this is accurate.  However, the district attorney's personal knowledge is unimportant because the court of criminal appeals has allowed relief when the State unknowingly sponsors or uses false testimony.  *See Ex parte Chabot*, 300 S.W.3d 768, 770–71 (Tex. Crim. App. 2009).  What is important is that, as he essentially concedes, Appellant cannot make a showing that the testimony was false.  Instead, Appellant complains that the State successfully moved to quash a subpoena seeking material related to the meeting and avoided a hearing on this issue.  On the record before us, we cannot conclude that Tucker presented false testimony, and so there is no basis on which

---

[6] The first assertion does not appear to be factually correct.  Tucker testified that "members of the District Attorney's Office" were present.  Martin testified that a specific assistant district attorney, not the district attorney, was present.

to conclude that Appellant's due process rights were violated.  We overrule Appellant's fifth issue.

## DISPOSITION

Having overruled Appellant's five issues, we *affirm* the judgment of the trial court.

### SAM GRIFFITH
Justice

Opinion delivered April 29, 2011.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(DO NOT PUBLISH)