

# NUMBER 13-23-00499-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

JORGE MICHAEL ABUNDEZ JR.
A/K/A JORGE MICHAEL ABUNDEZ
A/K/A JORGE ABUNDEZ,                                              Appellant,

v.

THE STATE OF TEXAS,                                               Appellee.

## ON APPEAL FROM THE 404TH DISTRICT COURT
## OF CAMERON COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices West and Fonseca**
**Memorandum Opinion by Justice West**

Appellant Jorge Michael Abundez Jr. a/k/a Jorge Michael Abundez a/k/a Jorge Abundez was indicted for capital murder of an individual under ten years of age, a capital felony (Count 1), and recklessly causing serious bodily injury to a child, a second-degree felony (Count 2). *See* TEX. PENAL CODE ANN. §§ 19.03(a)(8), (b), 22.04(a)(1), (e). The jury

could not reach a verdict as to Count 1 but convicted appellant on Count 2. The punishment for Count 2 was enhanced by a prior felony offense, and appellant was sentenced to sixty years' imprisonment. Appellant argues by two issues that (1) there was insufficient evidence to support the jury's verdict, and (2) the trial court abused its discretion when it denied his motion for mistrial. We affirm.

## I. BACKGROUND

Count 2 of the indictment alleged that appellant, on or about April 19, 2017, in Cameron County and the State of Texas,

> did then and there recklessly cause serious bodily injury to [K.C.,[1]] a child 14 years of age or younger, by hitting or punching or kicking or stomping on [K.C.] causing the death of [K.C.], against the peace and dignity of the State.

Appellant pleaded not guilty. The case proceeded to trial on October 23, 2023, and occurred over seven days.

## A. Trial

Jose Ruedas, a lieutenant firefighter with the Harlingen Fire Department, responded to a call to assist emergency medical services at a residence on April 19, 2017, at 4:03 p.m. Upon arrival, H.A., later identified as appellant's mother, let him in through the front gate and into the home. Ruedas observed K.C., a two-year-old child, lying in the middle of the living room floor with S.G., her mother. Ruedas testified that S.G. was holding K.C., and K.C. appeared "motionless" and "unresponsive." He asked S.G., H.A., and the other children in the house to follow him outside while the paramedics started CPR on K.C. When Ruedas went back inside, he observed "obvious bruising" to K.C.'s

---

[1] To protect the identity of the child, we refer to her and her family by their initials. *See* TEX. CONST. art. I, § 30(a)(1) (providing that a crime victim has "the right to be treated . . . with respect for the victim's dignity and privacy throughout the criminal justice process").

forehead and other bruising on her body of various colors, which he testified indicated different phases of the healing process.

When Ruedas inquired about how the injuries to K.C. occurred, K.C.'s seven-year-old brother, I.C., pointed towards the staircase and indicated that K.C. fell down the stairs. Ruedas testified that the injuries he observed on K.C.'s body were not consistent with what looked like a fall down a staircase and appeared to be a combination of new and old injuries. On cross-examination, Ruedas clarified that he did not observe appellant in the residence that day. He further testified that the bruises on K.C.'s forehead, specifically, could have resulted from falling down the stairs. K.C. was unable to be resuscitated and was pronounced dead at the hospital.

H.A. testified that she owned the residence with her husband, and appellant, S.G., and their four children lived at the house. Two of S.G.'s children, K.C. and I.C., were from a prior relationship, and the other two were appellant's biological children. Evidence conflicted as to whether H.A. and her husband also lived at the house during this time.

H.A. testified that, on the day of the incident, she was at work when S.G. called her and told her K.C. had fallen down the stairs. H.A. testified that when she arrived at the house appellant was not there, and S.G. seemed "normal." She said S.G. did not want to call 9-1-1 because she was afraid her children would be taken away. H.A. put rubbing alcohol on K.C. "to get her to react" and then called 9-1-1. H.A. said she stayed with the other three children until her husband arrived before they all went to the hospital together. The Department of Family and Protective Services (the Department) later picked up the children from her care. H.A. testified that she saw K.C. the day before she died and did not notice any bruises on her.

3

Narciso Hernandez, a special investigator with the Department, responded to the hospital on April 19, 2017. Hernandez observed K.C.'s body and saw "significant trauma to her entire body and various bruises appeared to be in different types of healing stages," including bruises on her forehead, chest, ribs, back, buttocks, and legs. He also observed that she was thin. Hernandez interviewed both appellant and S.G. at the Harlingen Police Department. Hernandez testified that appellant told him he was working that day, and S.G. told him that she had been at home all day taking care of the children. Hernandez also interviewed H.A. and attempted to take a "home assessment" of the residence. H.A. did not give him permission to go upstairs, and he was only able to see the downstairs bedrooms. The Department concluded there was "reason to believe that physical abuse, medical neglect and neglectful supervision did occur validating both [S.G.] and [appellant] with the result of the children being removed from their care."

Despite S.G.'s statements to Hernandez and Ruedas that she was at home the entire day of K.C.'s death, other evidence at trial placed S.G. at work at that time. S.G.'s manager, Maria Isabel Fernandez, testified that S.G. was working on April 19, 2017, and S.G. told her that she needed to leave work after receiving an emergency call about her daughter. Fernandez authenticated time sheets from that day which showed that S.G. came into work at 10:06 a.m. and left at 3:15 p.m. Fernandez further testified that appellant typically dropped S.G. off at work in the mornings. Priscilla Guerrero, one of S.G.'s coworkers, provided testimony that was generally consistent with Fernandez's testimony about that day. Guerrero also testified that appellant typically drove S.G. to and from work.

4

S.G. testified that she lied to emergency responders, law enforcement, hospital staff, and the Department about what happened that day. She testified that she was, in fact, working on the day of the incident. Appellant, who took care of the children while she was at work, called her and told her something happened to K.C. and she was not waking up. When she arrived at the house, K.C. was lying down on the living room floor. S.G. said she tried to call 9-1-1, but appellant took her phone. Appellant and H.A. then began to concoct a story that I.C. pushed K.C. down the stairs because "they wouldn't do anything to somebody of his age since he was 7 years old at that time." She said, "After [appellant] was ready to leave the house, he gave me the phone back and said I could now call 911 but I had to say that I was the one there at the house during the accident." She proceeded to tell others that I.C. pushed K.C. down the stairs.

S.G. explained that she was afraid of appellant and went along with what he told her because he was physically and emotionally abusive. S.G. testified that appellant hit her, K.C., and I.C. He called them "worthless," "stupid," and "that [they] had no sense of doing anything." She witnessed appellant spank K.C. and I.C. with different objects and hit I.C. across the head. S.G. also described injuries K.C. sustained prior to the 2017 incident, including a fractured elbow, fractured ribs, and her front teeth being "knocked out." After these incidents, appellant allegedly instructed S.G. to take K.C. to different doctors. S.G. testified that these injuries occurred when appellant watched K.C., and she was at work.

The jury heard evidence of S.G.'s criminal history and plea agreement in this case. S.G. pleaded guilty to two misdemeanor theft charges, which occurred after K.C.'s death in 2018 and 2019. S.G. explained that she was originally charged with negligent homicide

of K.C., and appellant and H.A. bonded her out. As discovery unfolded, she and appellant were both charged with capital murder of K.C. In accordance with a plea agreement with the State, S.G. pleaded no contest to the reduced offense of injury to a child and agreed to testify truthfully against appellant. In exchange, the State would recommend ten years' probation on all of her pending charges.

I.C. was seven years old at the time of the incident and thirteen years old when he testified at trial. He said that after his mom and siblings moved into appellant's parents' house, appellant began hitting him and his sister. I.C. said that appellant hit them with a belt, sticks, his fist, and his hands on various places on their bodies. I.C. testified specifically that appellant hit K.C. with his hands, both with an open hand and closed fist, and kicked her multiple times. I.C. observed appellant kick her with his work boots in the ribs. Appellant would also discipline the children by having them stand in a corner "[f]or as long as he wanted." I.C. said that he and K.C. would wet themselves while standing because appellant would hit them if they tried to use the restroom. I.C. said H.A. saw appellant hit them, and "she always agreed with [appellant]." I.C. also said appellant hit them in front of S.G., but "[s]he couldn't really do anything about it" because appellant would hit her if "she tried to help us."

I.C. testified that, on the day of K.C.'s death, he and appellant were playing video games upstairs. At one point appellant got angry and put K.C. in a corner. After a while, "she just fell down and that was it." He said appellant looked scared when K.C. did not move and tried to revive her by splashing water on her. He said H.A. arrived soon after and also looked scared. He said either appellant or H.A. went to pick up his mom, and when she arrived, she started "yelling and crying" until appellant slapped her. He said that

6

"then they were trying to figure out if they were going to call the cops or not and after a while they ended up calling the cops." After his mom started calling 9-1-1, appellant left the house. Before he left, appellant and S.G. told him "to say a different story" and tell the police "that she fell down the stairs." I.C. testified that he started telling the true story about what happened once he stopped seeing appellant, and he was no longer afraid that he was going to hit him. On cross-examination, I.C. testified that he did not see appellant hit or abuse K.C. on the day she died.

A great deal of testimony was adduced related to I.C.'s alleged behavioral issues. The jury heard that in February 2017, I.C. was admitted to a behavioral hospital wherein he reported "punching [K.C.] on the abdomen area with close fist without provocation," "that monsters talk to him and command him" to hurt himself and his sister, and that he "has been experiencing severe mood swings, wants to be alone, isolative, withdrawn." It was also reported that I.C. engaged in "self-abusive behavior," such as punching himself "in the head and the face" and pulling out his hair. H.A. told police that I.C. was "aggressive" towards K.C. and that she had seen I.C. hit K.C. in the past. The jury also heard allegations that I.C. stabbed a relative in the knee with a fork. In contrast, I.C.'s principal, first grade teacher, and school counselors all testified that I.C. was a good student and they had seen no indications of violent or aggressive behavior. The Department caseworker assigned to the family's case testified that I.C. was never diagnosed with violent or behavioral issues. I.C. denied ever hitting his sister and did not remember why his parents took him to a behavioral hospital.

Dr. Elizabeth Miller, a forensic pathologist for Cameron County, performed K.C.'s autopsy. Dr. Miller first testified about K.C.'s medical history, including previous medical

7

visits for a broken arm, broken ribs, and broken teeth. She explained that K.C. saw many different doctors or medical providers, which she said is a sign that a child is in an abusive household. She also explained that K.C.'s weight was consistently very low, and by 2017, her weight was in the third percentile of children her age.

Dr. Miller testified that her examination revealed that K.C.'s injuries were not consistent with a fall down a staircase. She explained that "a fall down the staircase in a child rarely results in significant trauma," and typically results in scrapes on the arms, elbows or knees. If traumatic injuries are sustained, the injuries are "more likely to be head and neck trauma, fractures or long bone fractures." Dr. Miller did not observe any kind of head or neck trauma or long bone fractures on K.C. Instead, there were "multiple deep lacerations" in K.C.'s liver and kidney area, which she explained are splits "in the tissue due to blunt force trauma." She testified that blood from the lacerations slowly filled her abdominal cavity, and K.C.'s ultimate cause of death was blunt force abdominal trauma. She opined that K.C. died a slow painful death because it takes hours to die from these types of wounds. She estimated that K.C.'s internal injuries occurred at least eighteen hours before her death. Finally, Dr. Miller testified that it was unlikely that a seven-year-old boy could have caused K.C.'s fatal injuries.

**B.    Request for Mistrial**

Department investigator Amanda Cortez interviewed I.C. on January 25, 2018, following allegations of child abuse against appellant. The following colloquy transpired at trial:

> [The State]:    After that interview, what else did you do in your investigation of these new allegations?

8

[Cortez]: After that interview, I—I want to say a couple of weeks passed by and then I got a subsequent report.

[The State]: What was that subsequent report?

[Cortez]: That [I.C.] had, I believe, he had exposed himself at school and he made an outcry of sexual abuse by [appellant].

Appellant's trial counsel objected, arguing that Cortez's testimony violated Rule 404 and that the allegation was highly prejudicial. The trial court sustained appellant's objection, ordered the State to not make any reference to outcries of sexual abuse, and outside the presence of the jury, admonished Cortez to not talk about any outcries of sexual abuse. Appellant requested an instruction to disregard the testimony and moved for a mistrial. The trial court granted the instruction, instructed the jury accordingly, and then denied appellant's motion for a mistrial.

Appellant was convicted and sentenced as outlined above. This appeal ensued.

## II. Sufficiency of the Evidence

Appellant argues that there was legally insufficient evidence to support the jury's verdict. He argues that "there was no evidence to demonstrate a temporal proximity between the alleged violent acts of [a]ppellant and the fatal injury to the child."

### A. Standard of Review and Applicable Law

In reviewing the sufficiency of the evidence to support a conviction, "we consider the evidence in the light most favorable to the verdict" and determine whether, based on the evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Edward v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve

9

conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* (quoting *Jackson*, 443 U.S. at 319). "Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt." *Delagarza v. State*, 635 S.W.3d 716, 723 (Tex. App.—Corpus Christi–Edinburg 2021, pet. ref'd) (citing *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018)).

We measure the sufficiency of the evidence by comparing the evidence produced at trial against "the essential elements of the offense as defined by the hypothetically correct jury charge." *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The hypothetically correct jury charge 'accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Miles v. State*, 357 S.W.3d 629, 631 (Tex. Crim. App. 2011) (quoting *Malik*, 953 S.W.2d at 240).

A hypothetically correct jury charge in this case would instruct the jury to find appellant guilty on Count 2 if he recklessly caused serious bodily injury to K.C. *See* TEX. PENAL CODE ANN. § 22.04(a)(1). "A person acts recklessly . . . when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur." *Id.* § 6.03(c). "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.* "Serious bodily injury" means "bodily injury that creates a substantial risk of death or that causes death, serious

10

permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(46).

## B.    Analysis

Appellant argues that the evidence was insufficient to support a conviction for injury to a child because "the State provided no evidence to establish a nexus between [a]ppellant and K.C. at the time when the fatal injury allegedly occurred." Appellant seemingly argues that the State failed to prove that he had the opportunity to inflict the injuries which ultimately resulted in K.C.'s death. He contends that the evidence established that (1) K.C. passed away from injuries inflicted at least eighteen hours before her death, (2) he did not abuse K.C. on the day of her death, and (3) the "only evidence of an adult having an opportunity to harm K.C. [was] on April 18, 2017," which was when K.C. was in S.G.'s care.

While appellant contends that the evidence showed that only S.G. had the opportunity to harm K.C. eighteen hours before her death, he merely cites a portion of S.G.'s testimony where she stated that she bathed K.C. the night before her death. The record does not indicate who took care of S.G. "eighteen hours before her death." However, viewing the evidence in the light most favorable to the verdict, we conclude the jury could have reasonably found that appellant, at some point, dealt the injuries which led to K.C.'s death. *See Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023) ("If the record supports conflicting inferences, the reviewing court must presume that the factfinder resolved the conflicts in favor of the prosecution and defer to the jury's factual determinations.") (cleaned up); *Edward*, 635 S.W.3d at 655. The jury heard evidence that appellant and S.G. lived together with their four children, appellant typically watched the

11

children while S.G. was at work, and appellant abused K.C. on multiple occasions, including hitting her with his fists, spanking her with various objects, and kicking her in the ribs. The jury also heard evidence from S.G. and Dr. Miller that K.C., on three separate occasions, suffered a broken arm, ribs, and had her teeth knocked out, and these injuries occurred while appellant was watching K.C. and S.G. was at work.

While the defense advanced multiple theories for K.C.'s death—including an accidental fall from the stairs, that her "aggressive" and violent seven-year-old brother pushed her down the stairs, or that S.G. killed her instead—the jury was free to reject these theories because they relied on witness credibility. The jury could have instead chosen to believe the extensive testimony that K.C.'s injuries were inconsistent with a fall down the stairs. The jury also could have chosen to believe, from I.C.'s and S.G.'s testimony, that appellant failed to call 9-1-1 when K.C. became unresponsive, instructed them to lie about who was home that day, and fled the scene before law enforcement arrived. *See Devoe v. State*, 354 S.W.3d 457, 470 (Tex. Crim. App. 2011) (noting that flight evinces a consciousness of guilt); *Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) (same). The factfinder is the sole judge of witness credibility and resolving conflicts in testimony, and we may not disturb those determinations on appeal. *See Edward*, 635 S.W.3d at 655; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

On the evidence and reasonable inferences therefrom, the jury could have rationally found the essential elements of the crime beyond a reasonable doubt. *See Edward*, 635 S.W.3d at 655. We overrule appellant's first issue.

### III. MISTRIAL

By his second issue, appellant argues that the trial court abused its discretion when it denied his motion for mistrial after Cortez impermissibly testified that appellant had been accused of sexually abusing I.C.

### A. Standard of Review & Applicable Law

"A mistrial is an appropriate remedy in 'extreme circumstances' for a narrow class of highly prejudicial and incurable errors." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009) (quoting *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004)). "A mistrial halts trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Id.* "Because it is an extreme remedy, a mistrial should be granted 'only when residual prejudice remains' after less drastic alternatives are explored." *Id.* at 884–85 (quoting *Barnett v. State*, 161 S.W.3d 128, 134 (Tex. Crim. App. 2005)).

We review a trial court's denial of a motion for mistrial under an abuse of discretion standard. *Id.*; *see also Archie v. State*, 340 S.W.3d 734, 738–39 (Tex. Crim. App. 2011). Under this standard, "we do not substitute our judgment for that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable." *Becerra v. State*, 685 S.W.3d 120, 127 (Tex. Crim. App. 2024). In reviewing a trial court's ruling on a motion for mistrial, we must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Ocon*, 284 S.W.3d at 884. In doing so, we balance (1) the severity of the misconduct (i.e., the prejudicial effect of the improper testimony), (2) the court's measures adopted to cure the misconduct, and (3) the certainty of conviction

13

absent the misconduct. *Archie*, 340 S.W.3d at 739; *Saldivar-Lopez v. State*, 676 S.W.3d 851, 857–58 (Tex. App.—Corpus Christi–Edinburg 2023, no pet.).

## B. Analysis

The parties agree that Cortez's statement about I.C.'s outcry of sexual abuse was improper and should not have been admitted. *See* TEX. R. EVID. 404(b). However, Cortez did not disclose any details of the outcry, and the State did nothing to emphasize or repeat the testimony. *See Martinez v. State*, 17 S.W.3d 677, 693 (Tex. Crim. App. 2000); *Perez v. State*, 187 S.W.3d 110, 112–13 (Tex. App.—Waco 2006, no pet.) (considering whether the mistake was repeated, whether it seemed inadvertent or intentional, and the nature of the right affected in the court's analysis of the severity of the misconduct). The trial court instructed the jury to disregard Cortez's remark, and, typically, a prompt instruction to disregard will cure error associated with improper testimony. *See Archie*, 340 S.W.3d at 741; *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000). Appellant points to nothing in the record indicating the jurors disobeyed the instruction. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) (noting that "we generally presume that a jury will follow the judge's instructions").

Finally, any prejudicial effect that the testimony may have had was minuscule when compared to the strength of the evidence supporting the conviction. *See Archie*, 340 S.W.3d at 739. As established above, the jury clearly rejected the defense's alternate theories of K.C.'s death and chose to believe that appellant caused K.C.'s fatal injuries. Because the factors here weigh against a mistrial, we conclude that the trial court did not abuse its discretion when it denied appellant's request for a mistrial *See id.* We overrule appellant's second issue.

14

## IV.    CONCLUSION

The trial court's judgment is affirmed.

JON WEST
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
21st day of August, 2025.